MARENTETTE v. LUECHTEFELD et al.

No. 28869.

St. Louis Court of Appeals.

Missouri.

May 18, 1954.

Rehearing Denied June 11, 1954.

N. Murry Edwards, and Ninian M. Edwards, Jr., St. Louis, for appellants.

Marvin Q. Silver, and John W. Barry, St. Louis, for respondent.

BENNICK, Judge.

This is an action for damages for personal injuries sustained by plaintiff, Barbara Marentette, who was five years of age at the time of the accident in February, 1948, and who prosecutes her action through Charles Marentette, her father and next friend.

The Marentette family were tenants in a three-story apartment building located at 5906 Horton Place in the City of St. Louis. The building contained a total of twelve individual apartments, the one occupied by the Marentettes being on the second floor.

The defendants are Victor H. Luechtefeld, Eric J. Luechtefeld, and Oscar J. Luechtefeld, who were the Marentettes' landlords at the time of the accident.

The underlying legal question in the case is one of a landlord's liability to a member of his tenant's family for injuries attributable to the alleged dangerous and defective condition of a refrigeration gas line under the landlord's control.

Upon a trial to a jury, a verdict was returned in favor of plaintiff, and against defendants, for the sum of $1,100. Following an unavailing motion for a new trial, defendants gave notice of appeal, and by proper successive steps have caused the case to be transferred to this court for our review.

The Marentettes had been occupying the apartment for some seven or eight years at the time of the accident which has given rise to this proceeding.

When they first moved into the apartment their refrigeration was provided by a box which the then owner had installed in the kitchen of their apartment, and which was supplied with refrigerating gas from a central unit located in the basement. The type of refrigeration was the same in all twelve apartments; and the central unit in the basement together with the pipes supplying the boxes in the individual apartments were retained under the owner's exclusive control.

The box installed in the apartment proved to be unserviceable, and within a month or so after the inception of the Marentettes' tenancy it was removed by the owner at their request.

The gas which had supplied the box had been brought up from the central unit in the basement through a two-inch copper pipe which ran from the basement through the first floor apartment underneath the one occupied by the Marentettes, and then through their own apartment and from there to the corresponding apartment on the third floor immediately overhead. The pipe constituted a main refrigeration line, and the boxes in all three apartments through which it ran were connected with it by extensions running out to the respective boxes. In the Marentettes' apartment the main pipe entered through the floor some two to two and a half inches out from the wall; and at a point of separation 24 to 30 inches above the floor the extension of curled pipe for attachment to their box jutted out for a distance of 12 to 14 inches.

When the original box was taken out of the Marentettes' apartment, the extension of curled pipe was not removed but was pinched together with an instrument of some sort so as to seal it in that manner against the escape of gas which still flowed through the main line to the apartment overhead.

Incidentally, the defendants in this action did not become the owners of the building until quite some time after the original box had been removed, so that their liability, if any, must rest upon a somewhat different basis than that upon which the owner who removed the box might conceivably have been held if he had retained his status as landlord until the time of the accident.

After the original box was removed the Marentettes installed a box of their own at

the same location in the kitchen. However this box did not operate from the central unit in the basement, but instead was of a type that had its own unit and was plugged into an electrical outlet in the wall. Although it was not attached to or served by the pipe that went upward through the apartment, it did conceal the extension that had been pinched together and then left protruding out into the room. A year or so later the Marentettes purchased an entirely new box which they placed against the wall on the opposite side of the kitchen, leaving the pipe and extension fully exposed.

On the occasion in question the family had sat down to eat their evening meal at a kitchen table which had been pulled out from against the wall to a position on the floor close by the spot where the original box had stood. Each member of the family had taken his or her accustomed seat at the table, that of Barbara, the plaintiff, being directly in front of the extension, which was pointed towards her back. Suddenly there was a spurt of gas or vapor which sprayed across Barbara's back and shoulders, and which could be seen emerging from a crack which had opened up in the extension at the point where it had been pinched together when the first box had been disconnected. While defendants made some unavailing inquiry as to whether the break might have been caused by Barbara pushing her chair against the extension, the only real explanation suggested by the record is that it was due to deterioration which had taken place in the metal over a lengthy period of time.

Although the Marentettes had observed no leakage from the extension before the happening of the accident, they had nevertheless been apprehensive over the fact that it was still connected with the main line through which gas was constantly flowing, and had made requests on numerous occasions that it be removed. Plaintiff's mother, Roberta Marentette, had spoken directly with defendant Victor H. Luechtefeld on several instances when he happened to be around the building; and on one occasion some months before the accident he had actually come inside the apartment and had looked at the pipes in the kitchen. The usual excuse for refusing the Marentettes' request seems to have been that the removal of the extension would have entailed the draining of the entire unit, which was something that the successive owners had been unwilling to do.

Defendants stood on plaintiff's case and offered no evidence in their own behalf.

The case was submitted to the jury upon the issue of whether the gas line leading into the Marentettes' apartment was defective, and whether, if so, defendants knew or could have known of such defective condition in time to have repaired it before plaintiff was injured, but negligently failed to do so.

Defendants argue that the court was in error in failing to sustain their respective motions for a directed verdict.

They base their contention upon the assumption that because the accident happened within the interior of the Marentettes' own apartment, they could not be held liable as landlords for injuries sustained by plaintiff on account of a defective condition of the demised premises where there had been no covenant to repair.

In determining the liability of a landlord for personal injury to a tenant or to a member of the tenant's family because of a defective condition of the premises, there is indeed a clear distinction to be drawn between a case where the defective condition is in the premises demised to the tenant and of which he has been put into full possession and control, and one where the defective condition is in a portion of the premises (including agencies and appliances) which has been reserved by the landlord for use in common by his tenants as a group. In the first case, except for latent defects known to the landlord but not known to or discoverable by the tenant, the landlord is under no liability in the absence of an agreement to repair. Lasky

v. Rudman, 337 Mo. 555, 85 S.W.2d 501; Mahnken v. Gillespie, 329 Mo. 51, 43 S.W. 2d 797. In the last case the landlord is under a duty to exercise ordinary care to keep the reserved portion of the premises in a reasonably safe condition, and will be answerable in damages for personal injuries resulting from his failure to perform. Darlington v. Railway Exchange Bldg., 353 Mo. 569, 183 S.W.2d 101; Gray v. Pearline, 328 Mo. 1192, 43 S.W.2d 802.

Where defendants fall into error is in assuming that the facts brought this case within the first category. It is true that the extension where the break occurred was wholly within the premises demised to the Marentettes. However the extension was not an appliance within the Marentettes' personal control, but rather, being attached to the main refrigeration line which was designed to serve at least two other apartments from the central unit in the basement, was something retained under defendants' control. The Marentettes would have had no right to remove the extension, and it apparently could not have been removed without draining the entire unit. Defendants themselves had recognized in their conversations with the Marentettes that it was for them to say whether the extension should be removed; and inasmuch as the refrigeration system had been installed for the common benefit of different tenants, it was defendants' duty to see that all portions of it were maintained in a reasonably safe condition. Liability for any defective condition was of course dependent upon a showing of actual or constructive knowledge on defendants' part, but this element of plaintiff's case was made out by proof that one of the defendants had actually come into the apartment some months before the injury and inspected the extension for himself. In other words, defendants had acquired actual knowledge of the condition of the extension in ample time to have repaired it before the accident; and it was for the jury to say whether the condition shown by the evidence had rendered the extension dangerous and unsafe so as to have made defendants liable for permitting it to exist.

Defendants insist, however, that quite apart from any question respecting the matter of control, their several motions for a directed verdict should have been sustained upon the ground of lack of evidence to support a finding that the escaping gas caused the injuries of which plaintiff complained.

It is true that plaintiff's parents removed her from the apartment with all possible speed so that she was not exposed to the gas for any considerable period of time. Nevertheless it does not follow from this circumstance that her case must fail for want of substantial evidence to show a causal connection between the escape of the gas and her ensuing injury.

Both parents testified that plaintiff's eyes watered and that her nose began running immediately after the accident. She had had no cold or illness of any kind that might have otherwise accounted for her symptoms. The following day her temperature became high, and she broke out with a rash which covered most of her body and lasted for about a week. She was confined to her bed for three weeks, and to the house for several additional weeks after she was out of bed. All told she missed about two months from school, where she was in the kindergarten. The attending physician testified that he was certain in his own mind that the exposure to the gas had produced the condition which he found. The doctor's testimony, coupled with that of plaintiff's father and mother respecting what had actually occurred, sufficiently supplied the element of causal connection for the consideration of the jury along with the other issues in the case. Indeed, the facts themselves would have indicated, even without the aid of expert testimony, that the gas which struck and enveloped plaintiff was responsible for the condition that immediately appeared, and in this respect the case is readily distinguishable from Ambruster v. Levitt Realty

& Investment Co., 341 Mo. 364, 107 S.W.2d 74.

Finally defendants complain that the court committed error in giving instruction No. 1 at plaintiff's request.

This was plaintiff's principal instruction, and was predicated upon the hypothesis that inasmuch as the refrigeration system was for the common use of all the tenants, it was defendants' duty to use reasonable care and diligence to keep and maintain the pipe lines in a reasonably safe and fit condition. The jury were then charged, as has already been pointed out, that if they found that the line leading into the Marentettes' apartment was defective; that defendants knew or should have known of such condition in time to have repaired it before the accident but failed to do so; and that as a direct result of such failure plaintiff was injured by escaping gas, then their verdict should be in favor of plaintiff and against defendants.

The criticisms leveled at the instruction are largely a reiteration of matters that have already been considered. The theory of liability submitted by the instruction was within the scope of the negligence charged in the petition. The record clearly discloses that there was never the least doubt or uncertainty about the issues that defendants were called upon to meet. We have shown that there was evidence from which the jury were entitled to find that the extension was defective and dangerous, and that defendants had had notice of such condition in ample time to have repaired it before plaintiff's injury was received. If all these facts were found to be true, they would necessarily impose liability upon defendants and warrant a verdict in plaintiff's favor. Defendants have not indicated any imperfection in the instruction that could have prejudiced their rights in any manner. The judgment rendered by the circuit court should be affirmed, and it is so ordered.

ANDERSON, P. J., and ADAMS, Special Judge, concur.