Ronald **FITZPATRICK**, by His Father and Next Friend, J. B. Fitzpatrick, Appellant,

v.

Cecil F. **FORD** and Hazel H. Ford, Respondents.

No. 49713.

Supreme Court of Missouri,

Division No. 1.

Nov. 11, 1963.

Opinion Modified on Court's own Motion and Motion for Rehearing or for Transfer to Court En Banc Denied Dec. 9, 1963.

Edward L. Simmons, Plattsburg, Sevier & Turnage, Liberty, Walter A. Raymond and Raymond, West & Cochrane, Kansas City, for appellant.

Price Shoemaker, St. Joseph, Alan F. Wherritt, Liberty, James H. Ottman, John C. Dods, Kansas City, for respondents; Shook, Hardy, Ottman, Mitchell & Bacon, Kansas City, of counsel.

HOUSER, Commissioner.

Action for damages by two-year-old Ronald Fitzpatrick, suing through his father and next friend, for personal injuries sustained as a result of the collapse of the roof of a porch attached to a farm house owned by defendants Cecil and Hazel Ford. A trial jury awarded plaintiff damages in the sum of $120,000. Defendants' motion for a new trial was sustained by the trial court "because of error in the giving of instruction No. 1." Plaintiff appealed from the order granting a new trial. § 512.020, V.A.M.S.

Plaintiff-appellant contends there was no error in giving the instruction; that this was no valid ground for granting a new trial. Defendants-respondents assert that the instruction was prejudicially erroneous as a matter of law; that plaintiff failed to make a case in the first instance; that in any event the verdict is excessive.

Stated in the light most favorable to the prevailing party, the plaintiff, these are the facts bearing on liability: On May 13, 1960, while Ronald was playing on the north porch, the roof of the porch suddenly collapsed and fell on him, inflicting serious injuries. This house, located on a 160-acre farm in Clinton County, was owned by defendants Ford, husband and wife, as an estate by the entireties. J. D. Fitzpatrick, his wife and two sons, including Ronald, lived on this farm for several years under different arrangements with the Fords in different years. The arrangement for the year 1960 was "a cash deal, rent the farm" for a cash rental of $1,200. The payment of this rental was "for the farm and for the part of the house" that the Fitzpatricks "used," and did not cover "the part of the house that Mr. Ford used." At no time from the beginning of their occupancy of the farm did the Fitzpatricks have the use of the entire house. It was always the understanding and agreement with Cecil Ford that the northwest bedroom and the furniture therein were "his room and furniture," kept by him for his use as he saw fit. The bed, springs, mattress, rocking chair and two chests of drawers kept in the northwest bedroom were the personal property of Cecil Ford. "That was their [the Fords'] quarters." When the Fitzpatricks first moved onto the farm the room was reserved for the Fords' 15-year-old nephew, who stayed in the room and lived with the Fitzpatricks at Cecil Ford's re-

quest, for a year and a half while finishing his high school course. Cecil and Hazel Ford spent many weekends at the farm, and sometimes visited there during the week. They kept horses on the farm. They would hang their "farm clothes" in the closet across the hall from the northwest bedroom, which was a part of the portion of the premises reserved by the Fords. They kept clothes in a chest of drawers. They would change clothes in the northwest bedroom, and sleep in and use that room. Cecil Ford had a key to the house. The Fords would come and go, sometimes using the bedroom when the Fitzpatricks were not at home. It was not necessary for the Fords to ask the Fitzpatricks in advance for permission to come in and use the house. At no time was such permission sought. The Fitzpatricks used the northwest bedroom for their own or their family's purposes only once during the four years they occupied the premises, and that use was "subject to Mr. Ford's objection if he wants to use it."

This sketch, from a plat in defendants' brief, will assist in an understanding of the physical layout:

* where the accident occurred

The main entrance to the house—the one ordinarily used by the Fords and the Fitzpatricks—was the door leading into the inner porch from the north porch. There was a door on the south side of the house, opening into the kitchen, but it was not the principal means of entrance. Access to the northwest bedroom through the main entrance was had by entering the door from the north porch and going onto the inner porch, thence into the kitchen, thence into the living room, thence into the children's bedroom and thence into the small hall that led to the door opening into the northwest bedroom. The west porch was not used. There was a door leading from the west end of the hall to the west porch, but this was permanently closed and nailed shut at all times.

Before the Fitzpatricks moved onto the place the house, 50 or 60 years old, was "in very poor shape." Cecil Ford agreed "to remodel the house all the way through, and everything, he'd keep it up." He said "he would take care of the repairs and keep it suitable for [the Fitzpatricks] to live in." Cecil caused his brother Glenn, a roofing

contractor, to roof the porch, a "lean-to" porch, the roof of which was "just nailed up to the weatherboarding on the house." It was supported on the north side by three 4″ x 4″ posts. The floor of the porch was made of cement. In the fall of 1959, prior to the injury to Ronald on May 13, 1960, Fitzpatrick told Cecil Ford that Glenn Ford had said that the porch "needed some work done, * * * needed repairs." After Glenn roofed the porch Cecil "fussed about the job he'd" done, saying that it still leaked between porch and house and it was "running down." Cecil "got up there" and nailed a row of shingles across there leading down onto the porch, to stop the water leak. Before he nailed those shingles you could see rotten spots "up there along the side." Afterwards, the shingles covered the rotten spots. Later on there was trouble with the roof on the main part of the house. It leaked. It was a flat roof. In the fall of 1959 Glenn Ford, acting under the supervision and control of Cecil and Hazel Ford, changed some rafters, made the flat roof into a slanting roof, and put new shingles on both north and south sides of the roof. Glenn Ford and one Herbert Cook stood a ladder up on the porch, threw the shingles onto the roof, then walked across the porch roof and carried them to the other part of the house. Ford weighed 190 pounds and the bundles of shingles weighed 75 or 80 pounds each. As the two men walked across the roof of the porch it "gave" or "sprang" in the middle. Cecil paid Glenn for this work and for the materials. On that occasion Glenn and Herbert installed a 1″ x 4″ brace board, about 5 feet long, slanting up from the house to the north porch roof, on the east side of the porch but put none on the west side of the porch. That board was put on to brace the porch roof. Fitzpatrick did not assist in any of these repairs, or do "one bit of work to that house." Cecil Ford also caused storm windows and storm doors to be installed.

On the day of the collapse it was warm and clear and there was no wind. The whole porch roof came loose from the house, came down the wall, and fell on the plaintiff. The roof had been held up by "just a few spikes" nailed into the weatherboarding on the front of the house. The boards were old and dry-rotted. The spikes were "old square type nails, clinch type." They left scraping marks on the front of the house, as the porch roof came down. The angling wooden brace had pulled loose from the porch, and was hanging on the side of the house.

Defendants' evidence presented an entirely different set of facts; a direct conflict with respect to the contractual arrangement between the parties, retention of control over the northwest bedroom, agreement to repair and repairs actually made.

Cecil Ford testified that under the arrangement for the year 1960 Fitzpatrick got *the whole of the farm, all of the house,* and could do whatever he wanted to with it; that *no reservations whatever were made.* The Fords testified that the two families were all good friends who for years had had good times together, visiting back and forth in each others' homes; that the Fitzpatricks had access to the key to the Ford home in Kansas City; that sometimes the Fords brought groceries to the farm and the two families cooked their meals together and ate at a common table "just like one big family." The Fords sought to establish that Cecil did not own the furniture in the northwest bedroom, which they said was used by the Fitzpatrick family "like most any spare bedroom," and that while in the summertime Cecil would sometimes sleep in the northwest bedroom, at other times he slept in the living room on the couch; that when it was cold one of the Fords would sleep with the little children (presumably in the children's bedroom) and the other Ford would sleep in the living room on the couch; that when they stayed overnight the Fords would use the Fitzpatricks' bedclothes, and that the Fords used the south door, not the north door, most of the time when entering the house. The sum and substance of Fords' testimony was that there was no contractual reservation of any right on their

part to use the northwest bedroom, the entire house being rented to the Fitzpatricks; that on the occasions when they stayed there the Fords were there as close and intimate personal friends of the family, as social guests, not in any relationship of landlord and tenant by reservation of right.

An equally sharp issue was drawn on the question of agreement to repair, and repairs actually made. Cecil Ford flatly denied that he promised the Fitzpatricks that he would keep the house in repair; that Fitzpatrick had asked him to make repairs, or that Fitzpatrick said that Glenn Ford had said that the porch needed repair. On direct examination Cecil Ford specifically denied any knowledge of the roofing of the porch and, except for roofing the main part of the house and supplying storm doors and windows, denied any participation in repairs other than those jointly made with the Fitzpatricks, such as wallpapering and retarring the roof over one of the bedrooms. While on cross-examination he stated he "roofed the porch" in 1959 his brother Glenn claimed to have done this work for Fitzpatrick, stating that he never told Cecil about it and did not charge Cecil for the work. Defendants' evidence tended to show that the brace was not put on the porch in 1959, but was there long before, and suggested that it was there to support a downspout.

Whether there was a defect in the porch, the nature of the defect, whether it was discoverable and the cause of the fall were disputed questions. Cecil and Glenn testified they saw nothing structurally wrong with the porch that fell; nothing to indicate that the porch was not in good condition. Cecil testified that Fitzpatrick told him that he had made a statement that there was nothing visibly wrong with the porch; that if there had been anything wrong he (Fitzpatrick) would have "got up there and fixed it," and sought to establish that where the porch pulled away from the house the lumber was not discolored or rotten, but was sound.

Plaintiff's main verdict-directing Instruction No. 1, for the giving of which the trial court sustained respondents' motion for a new trial, follows:

"The Court instructs the jury that if you find and believe from all the credible evidence that on May 13, 1960, defendants Cecil Ford and Hazel Ford were the owners of the farm located north of Plattsburg described in evidence and that on such farm was located a house and that a portion of such house was occupied by J. D. Fitzpatrick and his family, of which Ronald Fitzpatrick was a member, as a tenant of the defendants Cecil Ford and Hazel Ford, and that defendants Cecil Ford and Hazel Ford reserved a portion of such house, and that an entrance to such house used both by the J. D. Fitzpatrick family and defendants Cecil Ford and Hazel Ford was covered by a porch as described in evidence, and that such entrance covered by such porch was used in common as a common ingress and egress by the J. D. Fitzpatrick family and by defendants Cecil Ford and Hazel Ford for the respective portions of the house used by each, then you are instructed that it was the duty of the defendants Cecil Ford and Hazel Ford, as the owners and landlord, to use reasonable care and diligence to keep and maintain said porch in a reasonably safe and fit condition for such use by Ronald Fitzpatrick.

"Therefore, if you find that on the 13th day of May, 1960, Ronald Fitzpatrick was injured when the porch described in evidence collapsed and fell, striking Ronald Fitzpatrick, and if you find that when Ronald Fitzpatrick was injured, the porch was not in a reasonably safe and fit condition and that defendants either knew of such condition or by the exercise of ordinary care would have known of such condition for such length of time before Ronald Fitzpatrick was injured as to have given them a reasonable opportunity and time to have repaired it before Ronald Fitzpatrick was injured, and if you find that notwithstanding such fact, defendants failed to put said porch in a reasonably safe

condition and that as a direct result of defendants said failure, Ronald Fitzpatrick was injured, then your verdict must be for the plaintiff."

■ From plaintiff's evidence, the verdict-directing instruction he offered, and his brief, it is apparent that plaintiff sought to recover under the "common use rule" that where a portion of the demised premises is reserved by the landlord for use in common by two or more tenants, or by himself and a tenant or tenants, a duty is imposed upon him to exercise ordinary care to keep that portion of the premises in a reasonably safe condition for the use intended and is liable for damages for personal injuries to the tenant or a member of the tenant's family resulting from a failure to perform that duty. Peterson v. Brune, Mo.Sup., 273 S.W.2d 278, and three cases cited, 1. c. 280 [1]; Sherman v. Bobrecker, Mo.Sup., 322 S.W.2d 898, 902; Roman v. King, 289 Mo. 641, 233 S.W. 161, 164, 25 A.L.R. 1263; Hunter v. Schuchart, Mo. App., 267 S.W. 411, 413; Karp v. Barton, 164 Mo.App. 389, 144 S.W. 1111; Miller v. Geeser, 193 Mo.App. 1, 180 S.W. 3, 8. The parties having treated this as a landlord and tenant relationship and the case having been tried on that theory below, we will treat it as such on this appeal.

The ultimate, basic question for the jury to resolve on the question of liability under the common use rule was whether the landlords Ford reserved control over the porch, Peterson v. Brune, supra, 273 S.W.2d, 1. c. 281, or included it in the demise of the house. The common use rule proceeds upon the theory that the portion of the premises subjected to common use (whether of several tenants, or of the landlord and a tenant or tenants) is not a part of the tenant's leasehold estate; that " * * * the landlord not having let it to any one of the tenants, he has, of course, reserved control thereof to himself." Karp v. Barton, supra, 144 S.W., 1. c. 1112. That is to say, a landlord will be liable to his tenant or his tenant's children "for injuries re-sulting from defects in the premises existing in passageways or other parts of the premises, the exclusive possession of which has not passed to any one tenant and the control of the use of which has been reserved by the landlord." Lahtinen v. Continental Bldg. Co., en banc, 339 Mo. 438, 97 S.W.2d 102, 106.

■ A verdict-directing instruction must require the finding of all essential fact issues necessary to establish the legal proposition on which the right to the verdict is based. Gaffner v. Alexander, Mo.Sup., 331 S.W.2d 622, 627[3]. Instruction No. 1 fails to require a finding of the essential fact upon which liability turns under the common use rule, namely, reservation and control of the porch by the landlords Ford. The instruction is in two parts. The first paragraph tells the jury that it was the duty of the landlords to use reasonable care to maintain the porch in a reasonably safe and fit condition upon a finding that the Fords owned a farm and farmhouse, a portion of which (unspecified) Fitzpatrick and family occupied as a tenant; that the Fords reserved a portion (unspecified) of the house; and that an entrance covered by a porch was used in common as a common ingress and egress by the two families for the portions of the house used by each, respectively. The second paragraph hypothesizes nothing with respect to control. It tells the jury to find a verdict for plaintiff if the porch was not in a reasonably safe and fit condition; if the Fords had actual or constructive knowledge of the condition, and the porch fell as a result of the failure of the Fords to put the porch in a reasonably safe condition.

■ The direction of a verdict for plaintiff should have been predicated upon the requirement of a finding that the parties intended to reserve to the landlords Ford control over the porch (not merely to reserve an unspecified "portion of such house"), subject to a joint or common user by both families, and that the parties did not intend to include the porch in the

demise. Defendants then would have been entitled to an instruction directing a verdict for them upon a finding of intention to demise all of the house, including the porch, except the northwest bedroom, and that that bedroom was reserved subject only to a privilege or right[1] in the landlords to use the porch as a means of access thereto. Hassell v. Denning, 84 Cal.App. 479, 258 P. 426, 427,[3]. The cases cited by plaintiff[2] all state the general common use rule, but the issue here is not the existence, but the applicability, of the rule. None of the cases cited by plaintiff controverts the proposition that an application of the common use rule requires a finding that the landlord retained control over the premises where the injury occurred. On the contrary, they recognize that retention of control is an essential element of liability. None of them holds that where the issue of control is in dispute plaintiff may omit from his verdict-directing instruction a requirement of a finding of reservation of control over that part of the premises where the injury occurs. In Peterson v. Brune, supra, 273 S.W.2d, l. c. 281 [4], in the special situation where there was no real issue in the case as to retention of control by the landlord, the necessary finding of retention of control was held to have been satisfied by an instruction merely requiring the evidential finding of use in common. The opinion carefully notes, however, that "under other evidence, the hypothesis referred to [use in common] might be insufficient, * * *." 273 S.W.2d, l. c. 282. The evidential finding of use in common was insufficient, without more, in the instant case, where the question of retention of control was one of the vital issues in controversy. It was error to give Instruction No. 1 without a sufficient hypothesis on the issue of control of the porch as a basis upon which the jury could fix liability upon defendants under the common use rule.

Instruction No. 1 is also erroneous for the reason that the first paragraph, which imposes a duty upon the defendants, is not related to the second paragraph, which is the verdict-directing portion of the instruction. The first paragraph hypothesizes facts the finding of which, according to the instruction, imposes upon the landlords Ford a duty to maintain the porch in a reasonably safe condition. The second paragraph proceeds to hypothesize other facts upon the finding of which the jury is directed to return a verdict for plaintiff. The two paragraphs, connected only by the word "Therefore" and their inclusion on the same sheet of paper, are not made interdependent, but are independent, and the verdict is not made to depend upon the finding of the facts in the first paragraph. As in O'Leary v. Scullin Steel Co., 303 Mo. 363, 260 S.W. 55, 62, "The first paragraph consists of a series of introductory conditional clauses, but contains no consequent clause to express the result, if the conditions be found true. It is rich in protases but contains no apodosis. It means nothing." The parallel continues. The second paragraph is open to the construction that a verdict must be rendered for plaintiff if the porch was not in a reasonably safe condition, to the actual or constructive knowledge of the defendants, in time to repair, and failure to repair. The word "Therefore" as used in Instruction No. 1 does not incorporate the first paragraph into the second because the second paragraph is complete in itself and independent of the first paragraph; it ignores the relationship of the parties, the reservation of control over the porch and all other questions, except those indicated, and authorizes a verdict. Even if the first paragraph had prop-

---

1. Perhaps in the nature of a license, as intimated in Kilmer v. White, 254 N.Y. 64, 171 N.E. 908, 909, [1].

2. Roman v. King, 289 Mo. 641, 233 S.W. 161, 164, 25 A.L.R. 1263; Schneider v. Dubinsky Realty Co., 344 Mo. 654, 127 S.W.2d 691. 696; Peterson v. Brune, Mo. Sup., 273 S.W.2d 278, 281; Hunter v. Schuchart, Mo.App., 267 S.W. 411, 413; Karp v. Barton, 164 Mo.App. 389, 144 S.W. 1111, 1112; Miller v. Geeser, 193 Mo.App. 1, 180 S.W. 3, 8.

erly' hypothesized the issue of control over the porch, which it did not, the jury would still have been confused and misdirected. Confused because left to speculate "whether the element of control was a necessary part of plaintiff's case," Tucker v. Taksel, Mo. App., 345 S.W.2d 385, 388[4], and misdirected because the second paragraph, complete in meaning, omitted any reference to the element of control, so that the finding of a verdict was not made to depend upon the finding of one of the elements of the plaintiff's case. Instruction No. 2 in Tucker v. Taksel, supra, a landlord and tenant case, stricken down for these same reasons, was strikingly similar to our Instruction No. 1.

Other complaints against Instruction No. 1—that it failed to identify the "portion of such house" reserved; failed to submit facts (existence of a specific defect which ultimately led to the collapse of the porch, and whether the claimed defect was discoverable upon reasonable inspection by defendants) from which the jury could determine whether there was negligence; failure to submit the question whether the submitted facts constituted negligence—may be avoided by properly redrafting the instruction in the event of another trial.

■ Defendants oppose remand for a new trial on the ground that plaintiff did not make a submissible case. They claim plaintiff failed to establish by credible evidence that defendants did not let the porch to J. B. Fitzpatrick and failed to introduce evidence of retention of control of the porch by defendants. Without restating the evidence pro and con on the question of submissibility, suffice it to say that the question under the facts in this case is a close one. We deem it unnecessary to decide the question of submissibility because in any event enough was developed at the first trial to indicate that on remand plaintiff may be able to make a submissible case on the theory adopted; that the interests of justice require remand for a new trial, and that it is our duty in this case to follow the rule that "Where the trial judge has ordered a new trial for error committed during the trial, and the question of the sufficiency of the evidence to make a submissible case is very close, the furtherance of justice requires a case should not be reversed without remanding unless the appellate court is convinced the facts are such a recovery cannot be had upon proper retrial. [Citing cases.]" Milliken v. Trianon Hotel Co., Mo.App., 364 S.W.2d 71, 75, [8].

■■ Remand is in order for another reason, namely, that plaintiff made a case for the jury on another theory. Plaintiff pleaded that defendants' agents and employees "attempted to repair said porch by nailing boards thereto and to the house, but that said repairs were inadequate and were performed in a careless and negligent manner so that after said repairs were made said porch fell down and collapsed * * *." There was substantial evidence to support this allegation. The law is clear that "* * * if the landlord does undertake to make repairs, either voluntarily or by covenant, he must exercise reasonable care in doing so and is liable to his tenant for injuries caused by his negligence or unskillfulness in making the repairs or in leaving the premises in an unsafe condition." Bartlett v. Taylor, 351 Mo. 1060, 174 S.W.2d 844, 847, quoted with approval in Stewart v. Zuellig, Mo.Sup., 336 S.W.2d 399, 402, [2].

We need not rule on the question of the excessiveness of the verdict for the reason that this question may not arise on the new trial.

The judgment is affirmed and the cause is remanded for a new trial.

COIL and WELBORN, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.