Jerry M. JANIS and Joseph R. Janis, Minors, by Pearl Clark, Their Next Friend, Appellants,

v.

Charles L. JOST and Beatrice L. Jost and Laclede Gas Company, Inc., Respondents.

No. 51561.

Supreme Court of Missouri, Division No. 1.

March 13, 1967.

Marvin Klamen, Klamen, Fletcher & Weisman, Clayton, Burton H. Shostak, Hoffman & Shostak, St. Louis, of counsel, for appellants.

Carter, Fitzsimmons & Brinker, Paul E. Fitzsimmons, Clayton, Harlan & Harlan, J. L. Harlan, Jr., Clayton, of counsel, for respondents, Charles L. Jost and Beatrice L. Jost.

Charles F. Hamilton, St. Louis, for respondent Laclede Gas Co.

HIGGINS, Commissioner.

■ Action by minors for $25,000 damages for wrongful death of their father allegedly caused by landlords' negligence in failing to repair or maintain a flue in reasonably safe condition, and by natural gas supplier's negligence in respect to repair and inspection of a gas heater and failure to discover a dangerous condition in the flue. Answers were denials of the charges and pleas of contributory negligence. Judgment was for defendants on a directed verdict at the close of plaintiffs' case. Plaintiffs' evidence, then, circumstantial and direct, viewed in its most favorable light, Schneider v. Prentzler, Mo., 391 S.W.2d 307, 309[1, 2], established these facts:

On January 9, 1962, Oval Janis, age 49, father of plaintiffs, died as a result of carbon monoxide poisoning. At the time of his death, Mr. Janis was a tenant of Charles L. and Beatrice L. Jost at 2928 Lemp Avenue, St. Louis, Missouri. The Josts acquired this 50-year-old property in 1950. A center wall divides the building into two symmetrical parts, each with a basement, first-floor apartment of three rooms and bath, second-floor apartment, and third-floor apartment of two rooms and bath. The Janis family occupied the south first-floor apartment. The westernmost chimney on the south side was made of brick and contained two 9″ x 9″ stacks, one for the south second floor apartment and one for the Janis apartment. The flue opening into the front room of the Janis apartment was about 29 feet below the top of the chimney and approximately three feet of this flue were within the south wall of the apartment. A pocket about 12 inches deep extended below the flue opening to catch residue.

Mr. Janis rented the apartment in 1957 at which time he received keys to the doors. Jost retained a key to avoid breaking doors and installing new locks in case the tenant left with the keys; it was never used to enter the Janis premises. The Janis family was given complete control of its 3-room unfurnished apartment and was privileged to exclude all persons from the premises during their occupancy as month-to-month tenants. Mr. Janis owned and installed his own 28,000 BTU circulating space heater and it burned natural gas through a separate gas meter and piping serving only the Janis apartment. Mr. Janis was billed directly by the gas company. The heater was located in the front room and was connected to the flue opening by about six feet of stovepipe. The Josts did not know who installed the heater and its vent pipe and they were unaware of any chimney stoppage at any time during the Janis occupancy. The Josts would redecorate apartments and clean and cap flues when the apartments were vacant but, during occupancy, maintained only the outside of the building. The chimneys on the building were tuckpointed in 1959 and coping tile was installed on them about a year after the accident.

Oval Janis and his wife were found dead in their bed in the middle room of the apartment. Joseph, who also slept in that room, was found in a stuporous condition. Jerry slept in the front room by the heater and was found unconscious. Both boys revived at the hospital. The weather was extremely cold. Upon his arrival, Corporal King of the police department found the windows and doors of the apartment closed. The heater was on; the room was hot. Sergeant Walsh arrived later and turned off the heater. He turned it back on and

found it to be operating well. It was again turned off and then dismantled. Discolored sand, mortar and soot were found to be blocking the vent pipe and the stack opening. The pipe and the wall around the opening showed some soot, moisture, and rust streaks.

On December 23, 1960, Roy Bockenholt, a serviceman for Laclede, received an order to adjust the heater. He found soot had formed on the grate. He adjusted the air on the burner, the same was stopped up, and he cleaned the lint from the burner. He left instructions for the customer to disconnect the heater and clean it of carbon. He left the heater turned off.

In the opinion of William Coad, mechanical engineer in the heating business, "a reasonable standard of safety commensurate with the danger," would have required the serviceman to check the draft "verifying whether or not there was a blocked flue." In this opinion, he assumed that the serviceman who found soot on the grate meant the surface of the burner. He recognized also that he may have meant soot on the radiant or ceramic material. Carbon monoxide is a product of combustion and usually is carried away by the flue but, if the flue is blocked, it is directed through the draft diverter back into the room. Soot, also, ordinarily is carried away through a vent with a good draft. Soot would be produced in the heater by improper adjustment of the air opening on the heater or an inadequate draft. When a flue is open there is little opportunity for heat gases to cool within the flue and thus little condensation. Mortar in a chimney normally slowly deteriorates with age, becomes granular, and falls to the bottom of the flue, thus producing a rising level of debris. Tuckpointing, tremors, sonic booms, temperature extremes, and hammering increase the rate of deterioration. In the opinion of Ronald R. Edwards, architect, it is a safe, necessary, and recommended practice for anyone who has a space heater to make inspections to see if his vent is clear and the draft is proper.

Following the accident, Laclede's serviceman J. Hecht "removed four-inch vent from heater and found building flue stopped with sand and mortar. The heater was not carbonized and combustion was good. Meter was turned on in 1958. The last complaint here was in December of 1960."

Mr. Janis was mechanically inclined and was employed as a typewriter serviceman earning $103 per week.

Appellants contend that the evidence that Laclede's employee who adjusted air on the burner of the Janis heater "found soot on the grate, which indicates improper burning; that the employee failed to turn off the gas * * * at its source, coupled with expert testimony that a failure on the part of the employee to inspect the flue and vent system of the unit was a failure to exercise a reasonable degree of safety commensurate with the risk; that no such inspection was made; that carbon monoxide was produced by improper burning causing decedents' death," was sufficient to warrant submission of their case against Laclede to the jury.

The indispensable element of this action against Laclede is proof of the allegation "that in December, 1960, and subsequent thereto, said flue leading to the premises occupied by Oval Janis was substantially blocked, causing the creation of carbon monoxide gas within and without of the heater, attached to said flue by means of a vent pipe, and within the premises occupied by Oval Janis." The thrust of appellants' argument against Laclede is that Laclede, in making the December, 1960, service call nearly thirteen months prior to the death of Oval Janis, negligently failed to discover that the house flue was then blocked and negligently failed to disconnect the heater.

No direct evidence was adduced which tended to prove that the house flue was blocked at the time of the service call; and the circumstantial evidence offered on this issue falls short of being

such that a jury could be permitted to infer from it, without resort to guess and conjecture, the further facts necessary to demonstrate a breach of Laclede's duty. Gaddy v. Skelly Oil Co., 364 Mo. 143, 259 S.W. 2d 844, 848[6]; Craddock v. Greenberg Mercantile, Inc., Mo., 297 S.W.2d 541, 548 [12].

Appellants say that their expert, Mr. Coad, testified that a partially or almost totally blocked flue condition existed at the time of Laclede's inspection, but such is not the case. Mr. Coad did testify in respect to rust, moisture, and condensation found on the wall and vent pipe January 9, 1962, that " * * * it's not something that happens within a few days; it takes a longer period of time. Again, I couldn't say specifically what period of time." The condition was said to have existed "for some time longer than a few days or a few weeks" and that it "existed for several months of heating system operation. That's as close as I can pin it down." When asked whether "a totally blocked flue condition" existed in December, 1960, Mr. Coad could give an opinion only "with qualifications." He then stated that if the air adjustment on the burner had not been changed between December, 1960, and January 9, 1962, it would be his opinion that the flue was blocked "or a partial or almost total blockage of the flue" existed "roughly six heating months. * * * Now, if the heater had been adjusted in between, of course, this assumption would not hold." Nothing was offered on the issue thus made of lack of adjustment "in between," and "a child could turn the adjustment plate." Mr. Coad stated there are "about seven" heating months in a year, and seven or eight heating months intervened between the service call and the accident. As a result of such testimony, a fatal inferential gap exists between vent blockage on January 9, 1962, and Laclede's alleged lack of inspection in December, 1960. Appellants attempted to prove that Laclede failed to check the draft by an interrogatory calling for a description "fully and in detail"

of Bockenholt's acts while on the Janis premises. The answer did not mention checking of the draft. If it be assumed that this proves nonfeasance amounting to negligence, it is of no avail here, absent proof, that such a check would have disclosed the blockage condition upon which this case is based. In other words, a condition not shown to have existed could not have been found, and failure to inspect under such conditions could not be the proximate cause of these deaths.

■ According to Mr. Coad the soot found in the heater by Bockenholt was indicative either of an inadequate draft *or* an improper adjustment of the primary air opening. That Bockenholt chose to attend to the adjustment of the air control without any showing of what adjustment he made, if any, other than to clear it of lint, does not establish negligence in failing to inspect the flue, because where such circumstantial evidence tends to support equally either of two inconsistent factual inferences, one of which results in a failure of proof of alleged negligence, the factual issue or issues essential to a case may not be said to be established by legitimate proof. Lappin v. Prebe, 345 Mo. 68, 131 S.W.2d 511, 513[4]; Draper v. Louisville & N. R. Co., 348 Mo. 886, 156 S.W.2d 626, 634 [13]; Green v. Ralston Purina Co., Mo., 376 S.W.2d 119, 124[3].

Other discrepancies exist in appellants' interpretation of their evidence which point up the failure of their case against Laclede. They say that Bockenholt adjusted the venturi or air supply control to produce a good flame; the evidence shows only that he removed lint and "adjusted" the burner. No evidence was adduced to show what adjustment was made or that the need for any adjustment made was related to flue blockage. The inference that "the gas was not shut off at its source" is said to arise from the service ticket being silent "in this regard." The record shows only that Bockenholt "left the heater turned off" and there is no "ticket" in evidence. The only

mention of soot on the burner and of improper adjustment of the primary air opening or an improper draft came from the inferences drawn by Mr. Coad. The only evidence of soot in the heater was from Mr. Bockenholt and he found it on the "grate" of the heater, and Mr. Coad thought this could refer even to the ceramic material in the stove. No evidence was adduced to show existence of any rust and moisture conditions on the vent pipe and near the flue opening at the time Mr. Bockenholt serviced the heater. Appellants infer "that something was wrong with the unit is clearly evident from the fact that Bockenholt turned the heater off and left the premises." Such is purely speculation and guesswork because the only evidence in this connection was that the heater was left off for the specific reason and purpose of having the "customer * * * disconnect circulator heater and clean heater of the carbon."

They also complain of the heater being turned off in cold weather in living quarters while, at the same time, they would seek an inference of neglect from failure to turn the gas off "at its source," and there is no evidence on when or by whom the heater was relighted and whether it was cleaned or adjusted after Bockenholt left his instructions. All such matters are left to guesswork and speculation.

▪ Appellants have attempted to bring their facts into line with authorities which are readily distinguished. Gas Service Co. v. London & Lancashire Ins. Co., 8 Cir., 188 F. 2d 404, reviews the duties of gas suppliers concerning leaks or defects in piping including the elementary rule that there is no obligation on the gas suppliers as to customers' piping and appliances unless they have notice of the defect. The facts showed that a leak in the customer's service line caused an explosion and that the gas company had no notice of it. Fields v. Missouri Power & Light Co., Mo., 374 S.W.2d 17, involved an uncapped pipe in a tenant's premises. The gas company installed but did not turn on the gas supply to plaintiff's premises. Several controls were located in the same area and someone without authority did turn on the gas to plaintiff's premises and an explosion resulted. It was recognized that a gas supplier may be guilty of negligence if a defect in the customer's appliance causes injury "provided the supplier or distributor has sufficient notice of such leak or defect." 374 S.W.2d l. c. 22 [2]. It was also recognized that "merely shutting off the flow of gas is not sufficient when by reason of the location of the device used to shut off the gas, * * * an ordinarily prudent person would reasonably foresee that some unauthorized person might turn on the gas before the defect * * * would be remedied." 374 S.W.2d l. c. 24[3]. The latter rule does not affect this case because the control or turnoff for Janises' heater was located in premises under their exclusive control and therefore not subject to manipulation by unauthorized persons. Nothing in the citation supplies the missing element in appellants' case, i. e., proof that a blocked chimney existed at the time of Laclede's adjustment of the heater.

Finally, it is illogical to suggest that a blocked flue existed in December, 1960, when the only evidence of carbon monoxide poisoning resulting from a blocked flue was that of the deaths on January 9, 1962, and "four episodes in last three weeks— headaches, nausea, myalgia, dizziness— whole family has same illness" diagnosed as influenza, all after nearly thirteen months had elapsed in seven or eight of which the heater would have been in use.

Appellants contend that their evidence "that the chimney into which decedent's furnace flue was attached was used in common; that Jost had retained control or right to control over the chimney; that the flue was blocked by mortar granules from within the chimney which granules take a long time to accumulate; that the blocked flue causes improper burning of the furnace flame thereby producing carbon monoxide; that the flue was completely blocked at the time of decedent's death; that

said defendants could have discovered the condition in the flue had they inspected it; and that the carbon monoxide was the cause of death," was sufficient to permit plaintiffs to submit their case to the jury against the Josts.

■ "In determining the liability of a landlord for personal injury to a tenant * * * because of a defective condition of the premises, there is * * * a clear distinction * * * between a case where the defective condition is in the premises demised to the tenant and of which he has been put into full possession and control, and one where the defective condition is in a portion of the premises (including agencies and appliances) which has been reserved by the landlord for use in common by his tenants as a group. In the first case, except for latent defects known to the landlord but not known to or discoverable by the tenant, the landlord is under no liability in the absence of an agreement to repair. * * * the landlord is under a duty to exercise ordinary care to keep the reserved portion of the premises in a reasonably safe condition, and will be answerable in damages for personal injuries resulting from his failure to perform." Marentette v. Luechtefeld, Mo.App., 268 S.W.2d 44, 46–47[1, 2]. See also Coates v. Dewoskin, Mo.App., 379 S.W.2d 146, 148[2–4].

■ Under this rule it is clear that appellants' evidence fails to show that the flue which served the Janis heater was in any way reserved for common use or in any degree retained in the control of the landlord after the premises which it served were demised to Janis. The only evidence adduced on this crucial issue is contrary to appellants' theory. Mr. Jost was called as a witness for appellants and, according to him, it was explained to Mr. and Mrs. Janis at the time of the letting that they had complete control of their apartment and exclusive control of the flue which served only that apartment. The retention of a key by the landlord was not for inspection or repair but was only for entry at the termination of a tenancy in case the tenant failed to leave the key. Such practice enabled him to avoid breaking doors and locks at the end of a tenancy. Underwood v. Moloney, Mo.App., 397 S.W.2d 18, 22[1–3]. The heater, its vent, and its meter and supply were all under the ownership and exclusive control of the tenant, the landlord neither furnishing nor servicing the same. Appellants' architect, Edwards, established that the flue serving the Janis apartment had but one opening and that was in the Janis apartment available only to their inspection and cleaning.

Appellants argue that "there can be no question but that the chimney stack into which decedent's space heater was connected was used in common by the other tenants whose heaters were connected thereto in like manner; * * *. That Jost retained such control (of the chimney) * * * is clearly shown by the evidence that Jost attached a space heater vent system in the same chimney stack in the third floor apartment up above Janis * * *," and that Jost is thus liable for "failure to inspect or to clean the chimney." The insurmountable difficulty with that argument here is that no such evidence was adduced and, since no retained control or reserved or common use was shown, this case is distinguished from those cited by appellants in which control was retained by the landlord: Marentette v. Luechtefeld, supra, involved a refrigeration gas line serving a gas refrigerator furnished the tenant by the landlord; Green v. Kahn, Mo., 391 S.W.2d 269, involved a combination gas cooking and heating stove and attendant piping furnished the tenant by the landlord; Thompson v. Paseo Manor South, Inc., Mo.App., 331 S.W.2d 1, involved exposed heating pipes running through one tenant's apartment from the landlord's central heating system to another tenant's apartment; Fitzpatrick v. Ford, Mo., 372 S.W.2d 844, involved a porch on premises which were used in common by the tenant and the landlord; Sneed v. Henderson, 211 Tenn. 572, 366 S.W.2d 758, involved a

landlord's negligent repair of a gas refrigerator furnished the tenant by the landlord; Lederer v. Carney, Mo.App., 142 S.W.2d 1085, involved tenant's illness due to fumes from landlord's heating plant.

Nor is this case similar to Fitzpatrick v. Ford, supra, and Nuckols v. Andrews Investment Co., Mo.App., 364 S.W.2d 128, where the landlord, although having no duty to repair, undertook to repair defective premises and did so negligently. The only evidence of repair here was that of maintenance by cleaning and capping the chimney vent and covering the chimney top at times when the tenant's premises had returned to the landlord's control upon termination of tenancy.

This case has had its counterpart in other jurisdictions. In Grieser v. Huntington National Bank of Columbus, 176 Ohio St. 291, 199 N.E.2d 556, the landlord demised two floors of an apartment building to one Wilders. Wilders sublet two apartments and provided each with a heater. Grieser was Wilders' subtenant in one of the apartments and died from inhalation of fumes escaping from a lighted gas heater due to a clogged chimney into which the heater was vented. The owner of the premises was not liable because "A landlord who has demised property, parting with possession and control thereof to a tenant in occupation, is not responsible for injuries arising from defective condition of such premises, when that defect arises during the continuance of the lease." 199 N.E.2d 1. c. 558[1]. "As far as the evidence shows, the fee owners of the property, out of possession and control, knew nothing about the existing conditions, including the presence of the heaters, had no right to intrude into the premises, and were under no obligation to manage and supervise the activities being conducted there." 199 N.E.2d 1. c. 559.

In Roy v. Smith, 134 Cal.App., 240, 25 P. 2d 251, the complaint failed to state a cause of action against an owner of apartments in one of which Fern Roy was a tenant prior to her death by asphyxiation due to a defect in the operation and venting of the gas floor furnace in her apartment.

So, in this case, the trial court properly directed a verdict against appellants because their evidence failed to prove their theories of liability against respondents.

Judgment affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All concur.