[Civ. No. 35818. Second Dist., Div. Five. Jan. 27, 1971.]

MARION SCHWARTZ, a Minor, etc., Plaintiff and Appellant, v. McGRAW-EDISON CO., et al., Defendants and Respondents.

## COUNSEL

Cummins, White & Breidenbach and W. F. Rylaarsdam for Plaintiff and Appellant.

Brill, Hunt, DeBuys & Burby, Henry E. Kappler, Veatch, Carlson, Dorsey & Quimby, Frederick C. Quimby, Jr., and Henry F. Walker for Defendants and Respondents.

## OPINION

**FRAMPTON, J.**\*—

### Statement of the Case

The minor plaintiff, through her guardian ad litem, by her second amended complaint, sought damages for personal injuries alleged to have been sustained when a gas heater set fire to her nightgown. She named as defendants McGraw-Edison Company, a corporation (hereafter McGraw), A. F. Thompson Manufacturing Co., a corporation (hereafter Thompson), The Eastern Isles, Inc., a corporation (hereafter Eastern), James H. Wolfe, individually and doing business as Youngland (hereafter Wolfe), and Mary Anne March (hereafter March).

According to the allegations of the second amended complaint, defendant Eastern manufactured the nightgown which in turn was sold by Wolfe; the accident occurred on premises owned by defendant March which had been leased to one Clayton Thompson. As will hereafter be shown, the defendant Thompson (the corporation) had manufactured the gas heater and had thereafter placed it in the channels of commerce. After the accident, McGraw purchased certain assets of defendant Thompson and had by written agreement assumed certain products warranties for which defendant Thompson was liable to its customers. Defendant Thompson was never served in the action. Defendants Eastern and Wolfe entered into a compromise and settlement of plaintiff's claims in the sum of $131,250 and were dismissed from the action.

A jury was impaneled and sworn to try the cause. At the conclusion of the opening statement by plaintiff's counsel, defendants McGraw and March

---

\*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

moved for a nonsuit and dismissal of the action. The motions were granted. The appeal is from the judgment of dismissal.

## Statement of Facts

The following statement of facts is taken from the opening statement of plaintiff's counsel insofar as they are pertinent to the question of liability of respondents for plaintiff's injuries:

"We believe, ladies and gentlemen, that the evidence in this case will establish that Marion Schwartz, then six years old, now sixteen years old, was seriously and massively injured, as few people are, through the negligence of the manufacturer of the garment that she was wearing and the manufacturer of the heater in front of which she was standing to warm herself.

"Marion was born on February 18, 1953. At the time this accident occurred she was six years old. This was in 1959. The accident occurred on February 21, 1959, just a few days after her birthday.

"This garment was a flannelette, double-nap nightie, full length down to her ankles, which her mother had purchased in a store in Sierra Madre where the family lives. In December of '58 she bought it as a Christmas present for Marion. Marion had worn it a few times and it had been washed a few times.

"Marion's parents had a summer place in Newport Beach, not very far from the permanent home of Marion's grandparents who are Mr. and Mrs. Clayton Thompson. The Thompsons lived I think within walking distance. And Mr. Schwartz, who was then and still is now a principal of a high school in the Pasadena High School District, was also on weekend Navy duty at Los Alamitos. So the family was spending the Washington Birthday holiday and weekend down at the beach, which also made it easier for Mr. Schwartz to get to his Naval Air Station.

"Marion's grandparents wanted her to stay overnight with them. Marion up to that time had been a vivacious, beautiful child, normal in all respects, no physical disabilities. She is the third of four children, if I—I know there are four children. I believe she is the third of four children. And Marion's mother took her over to her grandparents the evening before the accident occurred, which would be on February 20th. She stayed there that night.

"Now, this home was a beach house, and it was located in the Balboa area on West Bay Avenue, which is a block away from the bay. On the bay there is Buena Vista Lane, and on Buena Vista Lane, across the way and

on the bay, is where Mrs. March, who will come up in our conversation, lived.

"The home I have sketched in rough on this board I won't fill in at this time. I will let the witnesses do that. This is a long bathroom I am pointing to here with two bedrooms off of it. A hallway. A kitchen. A dining room and a living room.

"In this bathroom—

"First, let me say this: This home had no central heating. It had been occupied for, oh, about twenty years by the Thompsons, the grandparents, and its only form of heating—They rented the home. The Thompsons didn't own it. At the time the accident happened Mrs. March owned the home. Previous to then a Mrs. Nabors had owned it. The Thompsons had always rented. The home had no central heating. It had the following: It had a gas jet protruding from the wall in the bathroom to which one could attach a gas heating device, it had a gas jet in the fireplace which was in the living room to which one could attach a heating device, and it had a kitchen stove. Those were the only methods that were prepared for heating.

"So the Thompsons had about, oh, eight or nine years probably before this accident happened—they had bought a heater from a local merchant which was manufactured by the A. F. Thompson Manufacturing Company. No relationship to the grandparents. Just a coincidence. And this heater had been operating in an apparently satisfactory manner, although it was an unvented heater. It was not vented to the outside. It was a standing, small heater, standing on the floor, connected up to the jet that protruded from the wall by a flexible hose. And they had used this heater for some time.

"Now, in the evening Marion stayed with her grandmother in her grandmother's room on a separate bed. Grandfather and Grandmother used the two rooms. Grandfather I believe used the room I am pointing to now and Grandmother the other room. Marion slept on a cot in the grandmother's room.

"Early in the morning she awoke, a little early, like many exuberant children of six, maybe about six or six-thirty. She ran in and jumped in bed with her grandfather. And her grandfather, being awakened, said, 'Marion, run out and get the newspaper.' Something to that effect.

"Marion ran outside and picked up the newspaper. It was a cold morning, cold for this part of the country, and it was drizzling with rain. So she had gotten chilled and a little wet. And was wearing this nightgown which I have previously described, a double-nap flannelette nightgown.

And she came back in. And she said to her granddaddy she was chilly and wet. Of course, there was no heat in the house other than the fact that apparently the heater had been lit earlier that morning by the grandfather, or it may have been left on all night. I don't know. But the heater in the bathroom was working. So her granddaddy said, 'I will fix the fire.' He started to fix the fire. And he said, 'You go on in. You go on into the bathroom and warm yourself.'

"So while he was putting the logs in the fire, she went in and stood in front of the heater. She didn't move the heater. She didn't touch it. It wasn't knocked over. But she stood in front of the heater. She may have picked up her little nightie to hold it in front of it.

"It is a heater with a grill on it, but it is a gas-burning heater, and the flames are inside with the grill on the outside.

"We believe the evidence will show that the flames at no time touched this garment, that nothing but the hot gases emitting from it touched the garment, that suddenly there was a flame at the bottom of it.

" . . . . . . . . . . . . . . . . . . .

"The evidence will show that this kind of a nightgown not only ignites easily, but once it ignites, it goes up like a Christmas tree. You don't have an opportunity to get out of it.

" . . . . . . . . . . . . . . . . . . .

"First let me say we have three defendants. We have the manufacturer of the garment. We have what we contend to be the successor in interest to the manufacturer of the heater. McGraw-Edison did not manufacture it. They bought the assets of Thompson. It is our contention that as a result of the agreement and the law they are responsible. And, third, we have Mrs. March who was the landlord.

" . . . . . . . . . . . . . . . . . . .

"As far as the heater is concerned, this heater, interestingly enough, you will find, has on it the seal of approval of the American Gas Association, an independent association which specifies for the trade certain minimum standards that all heaters must meet.

"The evidence will show the way a manufacturer gets the privilege of using the AGA seal is as follows: a prototype is submitted to the American Gas Association for their examination. They run their prescribed tests which are printed in it so that all manufacturers can see them. If that prototype passes the test, then the AGA tells the manufacturer you may use our

seal of approval provided that all of the heaters that you put out with such seal have the same qualities as the one that we have examined.

"But the control of using this is entirely up to the manufacturer. The AGA does not, the evidence will show, examine every heater that is sold. They only examine the one prototype, and they may make spot checks from time to time.

 "This particular heater which was probably purchased around 1951—and the accident happened in 1959—had been subjected to tests by qualified testing agencies and found that it does not conform to the standards of the American Gas Association in that it puts out gases hotter than it should under those specifications.

"The evidence will show that if one is standing near—if the garment is very close to the heater, but not touching it, the heat of those gases is such that they will cause the garment to go up in flames.

"The heater was an unvented heater. And at that time I believe the evidence will show that only vented heaters were allowed.

"Finally, as to Mrs. March, what we intend to prove there, Mrs. March purchased this house only a year or less perhaps before this tragic accident. She had been in it before the accident occurred. The Thompsons, who were desirous of having more heat and better heat, had decided that they would put in a vented gas heater in the wall. And they actually went down to buy one and had one delivered to their home. When it was delivered, it was found that certain construction work had to be done in order to vent it to the outside in accordance with the rules and regulations then in existence.

"Mrs. Thompson asked Mrs. March if she'd be willing to split the cost of—which I don't know, it was a couple hundred dollars I think—of putting in this heater. Mrs. March said no, she didn't think that was necessary, she thought the gas stove and the two gas outlets were sufficient.

"Although Mrs. March I don't think told Mrs. Thompson this at that time, the evidence will establish that Mrs. March didn't want to spend any money on this because it was her intention to do as she finally did, tear the house down and use it as a flower garden. She lived across the street on the bay. She had her house torn down and built a new one. And she had the rental unit torn down for a flower garden and I think she put a garage on it also for her home.

"So as far as Mrs. March is concerned, it is our contention that since she rented this place it was her obligation to furnish it with adequate heating

devices and to do whatever was necessary to see that it was safe and proper.

"Ladies and gentlemen, we believe that we will prove by a preponderance of the evidence that Eastern Isles acted without reasonable care, did not use ordinary care in the manufacture and sale of the garment, and that the manufacturer of the heater and its successor McGraw-Edison is responsible for putting out a defective heater which caused massive injuries, . . ."

At the conclusion of the foregoing statement and a statement by counsel for Eastern, counsel for March moved for a nonsuit, and counsel for McGraw also moved for a nonsuit. After some argument, the court took the motion of March under consideration and denied the motion of Mc-Graw. Later on the same day and before the court ruled on the March motion, plaintiff's counsel amended his opening statement, with permission of court, to add that "There was no electric outlet in the bathroom. There was a light if that can be called an electric outlet. Of course, one could hook up something with a cord running up to a light which dropped from the ceiling. But there were no light plugs, as we know it, for the insertion of a plug that would give heat by electricity."

After this addition to the opening statement of plaintiff's counsel and the introduction in evidence of the gas heater, the court granted the motion for nonsuit as to defendant March. The court then reconsidered its ruling on the McGraw motion and permitted plaintiff to place in evidence a letter contract between McGraw and Thompson bearing date December 15, 1961, whereby Thompson sold and McGraw purchased certain machinery, equipment, inventory, trade marks, and patents and the good will of Thompson. This contract also obligated Thompson to lease to McGraw for a period of 10 years the real property upon which Thompson had conducted its manufacturing business. The contract provided further that "Buyer assumes seller's liability on its product warranty, which warranty is that such products are guaranteed for one year against defective materials or workmanship." The lease contemplated by the foregoing contract bearing date of January 10, 1962, was also received in evidence.

Plaintiff's counsel was permitted to further augment his opening statement by adding thereto the following: "[T]he representative of the American Gas Association whom we have under subpoena and whom we expect to be testifying on other matters, but also in relation to this particular heater, will have with him records of that organization which show the time this particular heater first received their seal of approval. They have some sort of a bulletin or catalogue which lists approved appliances and who the manufacturer of them is. In the—I think it is the

1962 edition—the appliance up to 1962 is shown in the records as manufactured by A. F. Thompson Company, Tyler, Texas. Thereafter, in 1962, it shows McGraw-Edison, and then underneath it, paren, formerly A. F. Thompson Company."

Plaintiff's counsel represented to the court that he would be unable to produce any one who could testify concerning the meaning intended by the parties in the use of the language contained in either the contract of sale and purchase or the lease. The court then granted the motion for nonsuit as to McGraw. The appeal is from the judgment of dismissal following the granting of the motions for nonsuit.

### Contentions on Appeal

Plaintiff urges that the granting of the nonsuit as to McGraw was erroneous because (1) under the contract of sale between McGraw and Thompson, McGraw assumed the strict liability of Thompson for product defects; (2) if such contract is interpreted in such manner as to limit product liability, such limitation is void; (3) there is an issue of fact whether there was a de facto merger between McGraw and Thompson, and (4) public policy demands that McGraw, as part of the marketing enterprise for the defective heaters manufactured by Thompson, should bear the cost of plaintiff's injuries.

Plaintiff urges that the granting of the nonsuit as to March was erroneous because (1) the landlord here had a nondelegable duty to assure compliance with building codes by preventing the tenant from engaging in an illegal use of the leased premises; (2) there is a question of fact as to whether March owed a duty to plaintiff, and (3) public policy demands that a landlord be held liable where, as here, an illegal condition on the leased premises causes injury to a guest of the tenant.

### The Appeal as to McGraw

The rule with respect to the granting of a nonsuit has been stated as follows:

" 'The granting of a motion for nonsuit is warranted ". . . when, and only when, disregarding conflicting evidence, and giving to plaintiff's evidence all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff." ' [Citation.] Thus, before a judgment of nonsuit can be disturbed, there must be some substance to plaintiff's evidence upon which reasonable minds could differ; proof that raises mere speculation,

suspicion, surmise, guess or conjecture is not enough to sustain his burden. [Citations.] '. . . as pointed out in *Reese* v. *Smith,* 9 Cal.2d 324, at page 328 [70 P.2d 933]: "If the existence of an essential fact upon which a party relies is left in doubt or uncertainty, the party upon whom the burden rests to establish that fact should suffer, and not his adversary. [Citation.] A judgment cannot be based on guess or conjectures. [Citation.]" . . . Substantial evidence is required to establish each essential affirmative allegation—a scintilla of evidence is not sufficient for that purpose. (*Estate of Teed,* 112 Cal.App.2d 638, 644 [247 P.2d 54].)' [Citation.] Thus, the burden was upon plaintiffs to establish that defendants had some duty to them and breached it, and that such breach was the proximate cause of the accident; if there is no evidence of substance tending to prove the controverted facts necessary to establish the plaintiffs' case, the motions for nonsuit were in order. And '. . . "It is not necessary that there should be an absence of conflict in the evidence. To deprive the court of the right to exercise this power, if there be a conflict, it must be a substantial one." [Citations.]' . . ." (*Ulwelling* v. *Crown Coach Corp.,* 206 Cal.App.2d 96, 104-105 [23 Cal. Rptr. 631]; see also *Guillory* v. *American President Lines,* 230 Cal.App.2d 296, 301-302 [40 Cal.Rptr. 796].)

The following is clear from the opening statement that (1) McGraw did not manufacture the portable gas heater which allegedly caused plaintiff's injuries; (2) McGraw did not put the heater into the stream of commerce in that it was purchased sometime in the year 1950 by plaintiff's grandparents from a California retailer; (3) contractual relations between McGraw and Thompson, the manufacturer of the heater, were established on December 15, 1961, 2 years and 10 months after the accident which caused plaintiff's injuries and some 9 years after plaintiff's grandparents had purchased the heater.

Under the foregoing facts, as contained in the opening statement, the only question remaining is whether by the contract and lease agreement, plaintiff's exhibits 2 and 3 respectively, McGraw assumed the strict liability of Thompson for defects in the latter's products.

■ As heretofore pointed out, plaintiff's counsel stated that he could not produce extrinsic evidence bearing upon the intention of the parties in explanation of the provisions of either the contract of sale or of the lease agreement. In this state of the record the construction of the agreements presented a question of law for the determination of the trial court. (*O'Connor* v. *West Sacramento Co.,* 189 Cal. 7, 18 [207 P. 527]; *Clark* v. *Lesher,* 46 Cal.2d 874, 883 [299 P.2d 865].) ■ Where the interpretation of a written instrument does not turn upon the credibility of extrinsic evidence, an appellate court is not bound by a construction of the instrument placed

upon it by the trial court. (*Consolidated Theatres, Inc.* v. *Theatrical Stage Employees Union,* 69 Cal.2d 713, 724 [73 Cal.Rptr. 213, 447 P.2d 325].) This court, therefore, must examine the sale and lease agreement to ascertain whether they created any duty owed plaintiff by McGraw.

By the terms of the sale agreement, McGraw purchased from Thompson all of the latter's "tools, dies, jigs, furniture, fixtures, machinery, manufacturing equipment, trucks, cars, and other tangible personal property owned by the seller, including any such assets belonging to seller but in the possession of others, excluding, however, inventory which is covered by the following paragraph (3)."

Paragraph (3) above referred to included the purchase of raw materials, finished goods and work in progress except obsolete materials not suitable for use.

The agreement further provided that McGraw was to receive "All records, drawings, general information concerning customers, letter files, general correspondence and credit data," as well as "All trade names, trade marks, and patents, if any, owned or applied for by seller."

McGraw also received the right under the terms of the contract "to use the name of A. F. Thompson Manufacturing Company, and seller agrees to change its corporate name to permit its use by buyer." As part of the consideration for the sale of its assets, Thompson agreed to lease its plant facilities to McGraw; Thompson retained all of its accounts receivable but McGraw was to use its best efforts, short of legal action, to collect such accounts for Thompson; McGraw assumed liability for commissions due by Thompson on unfilled orders, and McGraw assumed responsibility for purchase orders which Thompson had placed with its suppliers.

The contract contained the following paragraph: "Buyer assumes seller's liability on its product warranty, which warranty is that such products are guaranteed for one year against defective materials or workmanship."

Under the contract McGraw did not assume liability for Thompson's accounts payable except those which related to purchase orders already placed.

The contract named a consideration of $60,000 cash plus the value of the inventory when ascertained.

The lease agreement bearing date of January 10, 1962, was for the term of 10 years from the date of the lease, for a total of $24,000 payable in monthly installments of $2,000, with any holding over to be construed as a tenancy at will at the same monthly rental.

It is appropriate to note that the doctrine of the manufacturer's strict liability in tort was first announced in California in the case of *Greenman* v. *Yuba Power Products, Inc.*, 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049], decided by the Supreme Court on January 24, 1963. The contract of sale whereby McGraw acquired title to a portion of the assets of Thompson was made a little over a year and one month prior to the adoption of the rule of strict liability by the Supreme Court. It could hardly be argued as a fact that the contract of sale was executed by the parties in contemplation of a rule of law which did not exist in this state at the time of the execution of the contract.

It is clear from the paragraph in the contract bearing upon the assumption by McGraw of the warranty made by Thompson to the purchasers of goods manufactured and sold by Thompson that such warranty related to merchandise sold within a year and was nothing more than the customary warranty of a manufacturer against defects in material and workmanship. We are satisfied as a matter of law that the contract of sale, as it relates to the assumption of warranty liability, does not impose any duty upon McGraw toward plaintiff for defects, if any, in the offending heater manufactured and sold some nine years before plaintiff's accident by Thompson. Furthermore, the contract of sale does not attempt to restrict the liability of Thompson by a disclaimer of warranty for a defective product manufactured and placed in the stream of commerce by Thompson. (Cf. *Vandermark* v. *Ford Motor Co.*, 61 Cal.2d 256, 263 [37 Cal.Rptr. 896, 391 P.2d 168]; *Greenman* v. *Yuba Power Products, Inc., supra,* at p. 63.)

### *Effect of Sale Contract on Liability of McGraw for Torts of Thompson*

The rule with respect to the liability of a corporation, which acquires the assets of another corporation, for the debts and liabilities of the transferor, has been summarized as follows:

"There is authority that as a general rule where a corporation sells or otherwise transfers all of its assets, its transferee is not liable for the debts and liabilities of the transferor, and that liability of a new corporation for the debts of another corporation does not result from the mere fact that the former is organized to succeed the latter. It is generally held that if one corporation purchases the assets of another and pays a fair consideration therefor, no liability for the debts of the selling corporation exists in the absence of fraud or agreement to assume the debts. The purchasing corporation is not bound to see that the consideration passing is applied to the payment of debts of the selling corporation. Notice to the purchasing corporation in such case that the selling corporation is insolvent is not notice that the directors intend to misapply the purchase money. The rule of non-

liability is especially applicable where the vendor corporation is still a going concern, with ample assets to meet its obligations. That there is no liability is true even though the purchasing corporation is organized by the stockholders or members of the vendor corporation, or by some of them, or by bondholders of the old corporation. Nor does the fact that the purchase was consummated by the acquisition of all the stock of the selling corporation change the rule so as to make the buying corporation liable. A change of name is immaterial in such a transaction.

"There are certain instances, however, in which the purchaser or transferee may become liable for the obligations of the transferor corporation. The transferee may be held liable for the debts of the transferor corporation: (1) where there is an express or implied assumption of liability; (2) where the transaction amounts to a consolidation or merger; (3) where the transaction was fraudulent; (4) where some of the elements of a purchase in good faith were lacking, or where the transfer was without consideration and the creditors of the transferor were not provided for; or (5) where the transferee corporation was a mere continuation or reincarnation of the old corporation." (19 Am.Jur.2d, Corporations, § 1546, pp. 922-924; *Malone* v. *Red Top Cab Co.,* 16 Cal.App.2d 268, 273 [60 P.2d 543].)

■ Here, the evidence before the trial court (opening statement augmented by contract of sale and of lease) fails, as a matter of law, to disclose that there was an express or implied assumption of liability; that the transaction amounts to a consolidation or merger; that the transaction was fraudulent; that the transfer was without adequate consideration, or that the transfer accomplished nothing more than a mere continuation or reincarnation of the old corporation. On the contrary the evidence disclosed a purchase of only a part of the assets of Thompson for which, as far as the record discloses, McGraw paid a valuable and adequate consideration, and that Thompson continued to exist as a separate corporate entity, being possessed of substantial assets acquired through the sale as well as assets which it possessed at the time of the sale but did not transfer to McGraw. Under these circumstances there is no basis in law to hold McGraw liable in damages for inquiries sustained as a result of a tort committed by Thompson. (*Kloberdanz* v. *Joy Manufacturing Company,* 288 F.Supp. 817, 821-823.)

■ We find no considerations of public policy, under the facts here shown, that would compel the imposition of such a liability upon McGraw.

### The Appeal as to March

The record discloses that the instrumentality which caused plaintiff's nightgown to ignite and burn was a small portable heater which had been purchased and was owned by plaintiff's grandparents. The heater was

standing on the bathroom floor and had been connected to the gas jet in the bathroom by a flexible hose.

We have examined the heater as did the trial court. The heater is a small portable heater (approximately 14 inches in height, 10 inches in width, 6 inches in depth, and weighing from 3 to 5 pounds) designed for and capable of being attached to or detached from an ordinary gas outlet by means of a rubber connection, at the end of a flexible hose, which will slip over the nozzle of the outlet upon hand pressure being exerted upon the rubber connection. The burner of the heater is completely encased in a metal shield which is coterminous with the outside dimensions of the heater, thus preventing objects outside the heater from coming in contact with the flames emanating from the burner. The heater is not equipped with a vent collar nor is it equipped for the attachment to it of a vent to the outside air. (Cf. Health & Saf. Code, § 16900.) ■ Assuming that the requirements of section 16900 are applicable to the instant heater, which is questionable because of required structural changes in the building and heater necessary to accomplish venting to the outside air (cf. *Brandwein* v. *Rodriguez,* 133 Cal.App.2d 433, 436-437 [284 P.2d 130]; 19 Ops. Cal. Atty. Gen. 173, No. 52-42, 4/3/52), still there is nothing in the record before us to suggest in any way that the unvented condition of the heater here under consideration contributed towards the accident which caused plaintiff's injuries. Furthermore, section 16900 of the Health and Safety Code appears to have been adopted as a safety measure to prevent asphyxiation from carbon monoxide gases produced by an unvented gas heater, and affords no protection to plaintiff here where the happening of the accident was due to claimed excessive heat and not to carbon monoxide.

■ ■ The heater was not a part of the premises leased to the grandparents, and March had no interest in, right to inspect, or right of control over the heater. There was no express or implied covenant in the lease agreement whereby March was obligated to furnish heat to her tenant. (Cf. 32 Am.Jur., Landlord and Tenant, § 748, p. 629.) Under these circumstances, March, the landlord, owed no duty to plaintiff to see that the heater was in a reasonably safe condition to operate for the purposes for which it was designed, and may not be held liable in damages sustained by a guest of her tenants proximately caused by a dangerous and defective condition of the heater which was not a part of the demised premises. (*Goodman* v. *Harris,* 40 Cal.2d 254, 265-266 [253 P.2d 447]; see also *Janis* v. *Jost* (Mo.) 412 S.W.2d 498, 503 et seq.; *Grieser* v. *Huntington National Bank of Columbus,* 176 Ohio St. 291 [199 N.E.2d 556, 558]; *Cook* v. *Seidenverg,* 36 Wn.2d 256 [217 P.2d 799, 800 et seq.].) ■ The provisions of

section 1941 of the Civil Code[1] are inapplicable to the factual situation here presented, as they may bear upon any duty owed by March to the plaintiff. (Cf. *Colburn* v. *Shuravlev,* 24 Cal.App.2d 298, 299 [74 P.2d 1060].)

Nor do the provisions of Ordinance No. 834 of the City of Newport Beach[2] (the place where the accident occurred), as set forth in plaintiff's opening brief, create a duty owed on the part of March to plaintiff.

Neither do the provisions of section 16905 of the Health and Safety Code[3] impose a duty on March toward plaintiff under the facts here shown.

We find no public policy which would demand that March be held liable to plaintiff for the injuries sustained by her caused in part by the alleged defective portable gas heater. To promulgate such a rule in the circumstances of this case would impose the duty on every landlord to inspect and to keep in repair every piece of portable household equipment brought onto the demised premises by the tenant which could be conveniently plugged into an ordinary electrical outlet, or which could be simply connected by a hose to a conventional gas outlet.

The judgment is affirmed.

Kaus, P. J., and Reppy, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 26, 1971.

---

[1]Civil Code section 1941 reads: "The lessor of a building intended for the occupation of human beings must, in the absence of an agreement to the contrary, put it into a condition fit for such occupation, and repair all subsequent dilapidations thereof, which render it untenantable, except such as are mentioned in section nineteen hundred and twenty-nine."

[2]Ordinance No. 834 of the City of Newport Beach as set forth in plaintiff's opening brief provides in part as follows:

"(a) *General.* Heat producing appliances other than electrical which conform to the requirements of this chapter.

"(b) *Approvals.* Each heat producing appliance and accessory shall be of a type complying with applicable nationally recognized standards as determined by an approved testing agency."

[3]Health and Safety Code section 16905 reads: "Every gas vent, gas water heater, or other gas appliance shall be maintained in good repair."