[Civ. No. 2933. Fifth Dist. Aug. 31, 1977.]

SCM CORPORATION, Cross-complainant and Respondent, v.
BERKEL, INCORPORATED, Cross-complainant and Appellant.

**COUNSEL**

Chinello, Chinello, Maddy & Shelton, Paul Auchard and John D. Chinello, Jr., for Cross-complainant and Appellant.

Petty, Andrews, Tufts & Jackson, James P. Kleinberg, Ellen McGinty King, Stutsman & Nagel and Gerald W. Stutsman for Cross-complainant and Respondent.

---

**OPINION**

**HOPPER, J.**—Gary Harvey brought an action against several parties including appellant Berkel, Incorporated (Berkel) and respondent SCM Corporation,[1] for personal injuries when his hand was caught in a meat grinder. Subsequently, appellant and respondent filed cross-complaints for indemnity against each other. These cross-complaints were severed from the main action. Trial resulted in a judgment adverse to Berkel, which appeals.

Although the cross-complaints filed against each other by appellant and respondent each proceeded on an indemnity theory, the parties subsequently entered into the following stipulation:

"IT IS STIPULATED, . . . that the cross-complaints filed by said parties herein shall be deemed amended to include a request to determine all issues and a declaration of this court of the rights, liabilities and obligations of each of said parties to that certain agreement of July 27, 1956 by and between THE SILEX COMPANY, a corporation, and U.S. SLICING MACHINE COMPANY, INC., a corporation, and any amendments thereto."

In accordance with this stipulation, the case was litigated as an action for declaratory judgment. No oral testimony was taken; the case was argued on the basis of 23 joint exhibits which were submitted for the court's consideration.

---

[1]Although the parties are referred to by several different names in the pleadings, there appear to be in fact only one appellant and one respondent. Accordingly, the parties will be referred to in the singular.

The complaint of Gary Harvey alleged that the meat grinder in which his hand was caught was a defective product, that it was negligently designed and manufactured, and that it did not comply with express and implied warranties with regard to its performance. This action has not as yet been tried, and the question of the liability of appellant and respondent to Harvey is not presently at issue. The question before the court is which of the parties will be obligated to satisfy the judgment in the event that judgment in the main action is entered against them.

Harvey was injured by a model number 2532 meat grinder (serial No. 871626H) which was manufactured in 1947 by the Enterprise Manufacturing Company. In 1952 Enterprise discontinued manufacture of model number 2532. In 1955, Enterprise merged into Silex, Incorporated (respondent); Silex continued Enterprise's operations as the Enterprise Division of Silex.

On June 27, 1956, Silex entered into an agreement with U.S. Slicing Machine Co. (appellant), the interpretation of which forms the crux of the present litigation. In this agreement, Silex's Enterprise Division was separated into a "commercial and industrial line," composed of "electrical food choppers of one-third horse power or greater, accessories thereto, and electrical coffee mills," and a "domestic line," which included "various hand-operated food choppers and electrical food choppers up to and including one-third horse power and accessories thereto." The agreement provided that Silex would sell the entire commercial and industrial line to U.S. Slicing Machine Co. (Slicing). To facilitate the sale, a new corporation, Enterprise-1956, was formed. The agreement therefore states that Enterprise-1956 rather than Slicing is the purchaser. Warren Sullivan, an attorney for Silex at the time of the sale, testified in deposition that the name "was to establish continuity of Enterprise operations and to indicate that it was an organization being formed in 1956 and really was temporary in nature." Enterprise-1956 merged with Slicing in 1957.

The agreement stated that Slicing "is desirous of extending its distribution and sale on an exclusive basis to the complete commercial and industrial line and of acquiring control of the manufacture of the said products and of all operations relating thereto . . ."

Clause 2 of the agreement provided that Silex was to transfer "the machinery and equipment employed in the manufacture of the said commercial and industrial line . . . and all drawings, sketches, lists of

parts and materials, processing data or route sheets, records and other engineering data of any and every kind relating to the said commercial and industrial line and all patterns, tools, dies, jigs, fixtures, gauges and other equipment employed in connection with the manufacture thereof, excluding such items as shall relate to the manufacture of knives and plates and the performance of the processes of tinning, painting, polishing, stamping of coffee mills and other operations of a minor nature. . . ."

Clause 2(a) provided that Slicing was to receive "all trade rights, trade marks, trade names, patents, interest in patents, and licenses under patents, if any, which relate exclusively to products manufactured as part of the said commercial and industrial line . . ." and that Silex was to license Slicing to use those trade marks, patents, etc., which related to both lines.

Clause 5(a) provided that Slicing was to have a right of first refusal over Silex's purchase of "all material . . . which may relate to or be employed in connection with the manufacture of obsolete models of products . . . in the commercial and industrial line . . . ."

Clause 15 provided: "First Party [Silex] warrants and represents that drawings, sketches, lists of parts and materials, patterns and tool equipment relating to current production of Models 2122, 2612, 2622, 2632, new Models 2712 and 2722, with accessories, and coffee mills, will be delivered to Enterprise-1956 in good and proper condition sufficient for manufacture, and that the processing data and equipment for the manufacture of heavy-duty meat choppers (other than Models 2641 and 2652), as well as service parts for old models shall be delivered in good and proper condition adequate for small quantity production."

The crucial provision of the contract is clause 8. It provided: "Enterprise-1956 agrees to assume all liabilities, obligations, contracts, orders for the purchase of material and warranties of First Party made in connection with the manufacture and sale of products assigned hereunder to Enterprise-1956 as part of the commercial and industrial line."

Warren Sullivan testified in his deposition that he discussed "law suits by parties injured while working with or on machines manufactured" with the attorney for Slicing, and that was culminated in the above clause.

Subsequent to the signing of this contract, Slicing became concerned about the possibility of a patent infringement action which might be brought against one of the Enterprise patents. Further discussions concerning paragraph 8 ensued, resulting in a letter which apparently constituted an amendment to the contract, in which Silex agreed to defend any patent infringement action and to make good any losses resulting from such actions. Included in this letter was the following statement: "The Silex Company herewith represents and warrants that apart from contracts, orders for the purchase of material, warranties and other obligations incurred in the normal course of the business of manufacturing and selling products contained in the commercial and industrial line of its Enterprise Division, there are no other liabilities except such as are specifically stated in the above Agreement and amendments thereto."

In 1970, Slicing changed its name to Berkel, Incorporated. Silex first merged into Proctor-Silex, Inc., and later merged into SCM Corporation.

The trial judge concluded that the agreement for the sale contemplated that appellant would "assume any and all such liabilities and obligations as are involved in the claims and causes of action asserted and alleged by plaintiff, GARY HARVEY . . . ." He therefore ruled that appellant must satisfy any judgment rendered in favor of Harvey against respondent, and must conduct at its sole expense the defense of respondent. He further concluded that no right of indemnity exists in favor of appellant against respondent for these costs.

Where extrinsic evidence has been properly admitted as an aid to interpretation of an agreement and the evidence conflicts, any reasonable construction by the trial court would be upheld when supported by substantial evidence. (*In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 746-747 [131 Cal.Rptr. 873, 552 P.2d 1169]; *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 258, p. 4248.)

In this case there was a conflict in the evidence between the testimony by deposition (one of the exhibits) of Sullivan, the attorney representing Silex during the negotiations and drafting of the 1956 agreement, and the affidavit in support of the motion for summary judgment (one of the exhibits) executed by Harold Hansen on behalf of appellant. The conflict centered around paragraph 8 as amended and the trial judge pointed out in his intended decision that his construction of paragraph 8 as amended

was supported by the Sullivan testimony. As set forth in the findings of fact the trial court concluded that under the terms of paragraph 8 there was an assumption of all liabilities, including the claims asserted by Gary Harvey. The trial court's conclusion was reasonable and amply supported by evidence. The judgment should be affirmed.

Furthermore, even were we to assume that there was no conflict in the evidence or that there was not substantial evidence to sustain the conclusion of the trial court and that it is our duty under *Parsons* to give the contract our own independent interpretation, for the reasons hereinafter stated, we would interpret the agreement in the same manner as did the trial court.

■ The general rule in the United States is that while a corporation which purchases assets from another does not thereby become liable for the obligations of the transferor, such liability may be imposed in several situations, one of which is where there is an express or implied assumption of liability by the transferee. (*Ray* v. *Alad Corp.* (1977) 19 Cal.3d 22, 28 [136 Cal.Rptr. 574, 560 P.2d 3]; see also Annot. 66 A.L.R.3d 824.)

The parties engaged in considerable argument as to whether this was an indemnity agreement.

■ For the most part, an indemnity agreement is treated like any other contract: the intention of the parties should be ascertained and the normal rules of contract law applied. (*Fidelity and Deposit Co.* v. *Whitson* (1960) 187 Cal.App.2d 751, 756 [10 Cal.Rptr. 6].) However, in assessing the intent of the parties, the courts are unwilling to find an agreement to indemnify a party against its own negligence unless the provisions are very clear and explicit. As the court stated in *Goldman* v. *Ecco-Phoenix Elec. Corp.* (1964) 62 Cal.2d 40, 44 [41 Cal.Rptr. 73, 396 P.2d 377]: "Although the cases have held that one may provide by agreement for indemnification against his own negligence [citations], the agreement for indemnification must be clear and explicit; the agreement must be strictly construed against the indemnitee. [Fn. omitted.] In view of the general rule that an implied indemnity does not reach to protect the indemnitee from a loss to which his negligence has contributed, we must look at least for an express undertaking in the document that he is to do so. If one intends to do more than merely incorporate the general rule into the written document, he will be required to fix the greater obligation in specific terms. And the extent of the purported indemnitor's

liability must be determined from an objective assessment of the language of the instrument."

In *Vinnell Co. v. Pacific Elec. Ry. Co.* (1959) 52 Cal.2d 411, 415 [340 P.2d 604], the court stated: "The rule in this state, as expressed in the cases referred to, is in accord with the weight of authority. 'In the overwhelming majority of the cases the result reached by their interpretational efforts can be condensed into the simple rule that where the parties fail to refer expressly to negligence in their contract such failure evidences the parties' intention not to provide for indemnity for the indemnitee's negligent acts.' (Anno., 175 A.L.R. 8.)" (*Id.* at p. 415.) See also *MacDonald & Kruse, Inc. v. San Jose Steel Co.* (1972) 29 Cal.App.3d 413 [105 Cal.Rptr. 725].

■    Use of such words as "indemnify" or "assume" is not significant in determining whether this rule of construction should apply. (See *Transport Indem. Co. v. American Fid. & Cas. Co.* (1970) 4 Cal.App.3d 950, 954 [84 Cal.Rptr. 856]; *Indenco, Inc. v. Evans* (1962) 201 Cal.App.2d 369, 371 [20 Cal.Rptr. 90]; and *Buffa v. General Motors Corporation* (E.D. Mich. 1955) 131 F.Supp. 478, 481.)

Appellant argues that paragraph 8 should not be read to include tort liability. He contends that unless indemnity provisions specifically state that they are applying to negligence, they are insufficiently specific to apply.

■    The purpose of the indemnity law requirement of clear and explicit language appears to be to serve the deterrence/risk-avoidance functions of tort law by looking with disfavor upon attempts by the negligent party to avoid accountability for its own actions. Such a purpose is not being served when a business or an entire line of a business' products is being sold. From the standpoint of deterring the manufacture of future defective products, it would appear to be more important to deter the corporation which is still manufacturing that line of products than the corporation which is no longer making them. Since appellant in this case has purchased the processing data and equipment for manufacturing service parts for old models, it is in the better position to avert future injury by, if necessary, replacing defective parts of those old models. Finally, if corporations in appellant's position are forced to bear the loss, they are in a better position to spread the loss among other users of the same type of product, while respondent is no longer in a position to do so.

In addition, it should be noted that here, unlike many indemnity agreements, the parties are contracting from equal bargaining positions. (See *Delta Air Lines, Inc.* v. *Douglas Aircraft Co.* (1965) 238 Cal.App.2d 95 [47 Cal.Rptr. 518].)

We conclude that although principles of contract law should apply and the intention of the parties should be determinative, it should not be necessary to look for unusually clear, express language in order to find a provision transferring tort liability in the sale of a business or line of business.[2] The question is one of contract interpretation, and we should use a pragmatic approach. (*Rossmoor Sanitation, Inc.* v. *Pylon, Inc.* (1975) 13 Cal.3d 622, 632-633 [119 Cal.Rptr. 449, 532 P.2d 97]; see also Conley & Sayre, *Indemnity Revisited: Insurance of the Shifting Risk* (1971) 22 Hastings L.J. 1201.) Here the contract on its face applies to *all* liability. We hold that the trial court correctly concluded that appellant has assumed liability for negligence by this provision.

■ Appellant contends that since the sales agreement took place at a time when no state had adopted the doctrine of strict product liability, such liability could not have been transferred by the agreement. It relies on *Schwartz* v. *McGraw Edison Co.* (1971) 14 Cal.App.3d 767 [92 Cal.Rptr. 776, 66 A.L.R.3d 808]. In *Schwartz*, defendant purchased "certain machinery, equipment, inventory, trade marks, and patents and the good will" of the manufacturer of a product which injured plaintiff. The sole provision with regard to liability in the agreement stated as follows: " 'Buyer assumes seller's liability on its product warranty, which warranty is that such products are guaranteed for one year against defective materials or workmanship.' " (*Id.* at p. 779.)

The court, in concluding that defendant could not be held liable on a product liability theory, stated: "It is appropriate to note that the doctrine of the manufacturer's strict liability in tort was first announced in California in the case of *Greenman* v. *Yuba Power Products, Inc.,* 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049], decided by the Supreme Court on January 24, 1963. The contract of sale whereby McGraw acquired title to a portion of the assets of Thompson was made a little over a year and one month prior to the adoption of the rule of strict liability by the Supreme Court. It could hardly be argued as a fact

---

[2]*Charles D. Warner & Sons, Inc.* v. *Seilon, Inc.* (1974) 37 Cal.App.3d 612 [112 Cal.Rptr. 425], a sale of a business case, is distinguishable on its facts and is a situation where the issue was not raised because all parties were of the opinion that they were operating under an indemnity agreement.

that the contract of sale was executed by the parties in contemplation of a rule of law which did not exist in this state at the time of the execution of the contract.

"It is clear from the paragraph in the contract bearing upon the assumption by McGraw of the warranty made by Thompson that such warranty related to merchandise sold within a year and was nothing more than the customary warranty of a manufacturer against defects in material and workmanship." (*Id.* at p. 780.)

*Schwartz* is distinguishable on its facts. There the provision on its face applied only to breaches of warranty. In the present case the agreement provided for the assumption of all liability. As previously stated, we have concluded that this provision was intended to include tort liability. It would seem that product liability, as a form of tort liability, would be included in the provision. As respondent points out, agreements such as this serve the purpose of corporate planning, in that "the parties can plan for their respective future obligations and agree on a purchase price that takes these obligations into account." It would appear that the parties intended the burden of liability for injuries caused by the commercial and industrial line to fall entirely on appellant's shoulders. Given the similarity of the three doctrines, it makes little sense to create a situation in which respondent must accept liability when it is based on product liability, while appellant is liable for recoveries on negligence and warranty theories.

Appellant contends that even if the agreement in paragraph 8 applies to tort liability, it does not apply to model 2532, since that model was no longer being produced at the time the sale took place. It points out that paragraph 8 applies only to "products assigned hereunder," and contends that the phased-out models are not included within this language. It further points out that paragraph 5(a) grants to Enterprise-1956 "a right of first refusal of the purchase of all material . . . which may relate to or be employed in connection with the manufacture of obsolete models of products . . . ." It contends that there would be no need to grant such a right of first refusal if obsolete models were included within products intended to be assigned under the contract.

Respondent points out that the parties intended to transfer "the complete commercial and industrial line" and that this line is defined as "electrical food choppers of one-third horse power or greater." There is no dispute that model number 2532 is an electrical food chopper "of

one-third horse power or greater." More significantly, respondent points out that the agreement not only appears to transfer the plans and equipment by which obsolete models may be built, but also transfers all trade rights, trade marks, trade names, patents, interest in patents, and licenses under patents relating solely to the commercial and industrial line (¶¶ 2, 2(a)). Appellant has thereby apparently obtained the right to build obsolete models if it becomes profitable to do so. Finally, it should be noted that paragraph 15 provides that the equipment delivered to Enterprise-1956 must be delivered in proper condition so that service parts for old models may be produced. If a model 2532 chopper had broken down, it would therefore appear that it would have to be taken to appellant rather than respondent for repairs. We conclude that the contract intended to transfer to appellant the rights to all models, old as well as new, and that its assumption of liabilities similarly included the older models.

The judgment is affirmed.

Brown (G. A.), P. J., and Franson, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 27, 1977.