823 F.2d 553
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
CARBONIC PRODUCTS COMPANY, Plaintiff-Appellant,
v.
WELDING & CUTTING SUPPLY COMPANY, a a Wholly-Owned
Subsidiary of Union Carbide, Defendant-Appellee.
 No. 86-1730.
 United States Court of Appeals, Sixth Circuit.
 July 17, 1987.
 
 Before WELLFORD, MILBURN and NELSON, Circuit Judges.
 PER CURIAM.
 
 
 1
 Plaintiff-appellant Carbonic Products Company appeals from the district court's entry of summary judgment in favor of defendants-appellees Welding & Cutting Supply Company and Union Carbide in this diversity action alleging breach of contract, fraud and conversion. For the reasons that follow, we reverse.
 
 I.
 
 2
 Plaintiff is a Michigan corporation which bottles and distributes carbon dioxide in compressed gas cylinders for various commercial and industrial uses. Prior to 1982, Welder's Needs, Inc., ("WNI") was a distributor of industrial gases in a variety of compressed gas cylinders and was plaintiff's largest customer. Plaintiff delivered the carbon dioxide to WNI in the cylinders, but title to the cylinders was retained by plaintiff. WNI used the cylinders to distribute carbon dioxide to its customers but was required to return the cylinders to plaintiff after use by its customers. WNI encouraged its customers to return the cylinders by charging $2.50 per month for use of each cylinder.
 
 
 3
 During the time WNI was purchasing carbon dioxide from plaintiff, it was also purchasing several other industrial gases from Union Carbide. WNI became heavily indebted to Union Carbide, and Union Carbide suggested that WNI satisfy its debt by transferring many of its assets to Union Carbide or one of its subsidiaries. Union Carbide audited WNI and discovered that approximately 1,172 cylinders presumably belonging to Carbonic could not be accounted for.
 
 
 4
 Welding & Cutting is a wholly owned subsidiary of Union Carbide and is a distributor of industrial gases. WNI and Union Carbide agreed that, pending final negotiations, Welding & Cutting would supervise the day-to-day operations of WNI after August 27, 1982. On March 2, 1983, the parties executed an "Assets Transfer Agreement" ("the Agreement") whereby WNI transferred substantially all its operating assets to Welding & Cutting. In exchange, Welding & Cutting assumed substantially all the liabilities of WNI and paid WNI $100.
 
 
 5
 On September 18, 1984, plaintiff filed suit against defendants seeking to recover for loss of the cylinders. First, plaintiff alleged that "a contract existed between plaintiff and defendants" obligating defendants to return the cylinders to plaintiff and that defendants breached the contract "by refusing and/or neglecting" to return the cylinders. Second, plaintiff alleged that defendants breached a "quasi-contract" and/or committed "fraud" by representing that the cylinders would be returned. Finally, plaintiff alleged that defendants were in possession of the cylinders and that defendants converted the cylinders by refusing to return them.
 
 II.
 A. Choice of Law
 
 6
 While the district court did not make clear whether it considered Michigan law applicable, we must assume that Michigan law was applied since plaintiff and defendants relied upon Michigan law in arguing the propriety of summary judgment. A federal court sitting in diversity must apply the conflict-of-laws rules prevailing in the state in which the court sits. Klaxon v. Stentor Electric Manufacturing Co., 313 U.S. 487, 496 (1941); Colonial Refrigerated Transportation, Inc. v. Worsham, 705 F.2d 821, 825 (6th Cir. 1983). Michigan law provides that " '[t]he validity and construction of a contract are controlled and to be determined by the laws of the situs, or place where the contract was entered into." ' Wells v. 10-X Manufacturing Co., 609 F.2d 248, 253 (6th Cir.1979) (quoting Rubin v. Gallagher, 294 Mich. 124, 128, 292 N.W.2d 584, 586 (1940)). On the other hand, Michigan law provides that the law of the forum will be applied in tort actions commenced in Michigan "unless the court determines that a superior foreign state interest exists which calls for application of the foreign law in order to reach a just resolution of the controversy." Smith v. Pierpont, 123 Mich.App. 33, 38, 333 N.W.2d 165, 167-68 (1983); see also Olmstead v. Anderson, 145 Mich. App. 160, 167, 377 N.W.2d 853, 857 (1985) (per curiam), aff'd, 428 Mich. 1, 400 N.W.2d 292 (1987).
 
 
 7
 We need not, however, decide whether these Michigan conflict-of-laws rules require application of Michigan or Ohio law. Neither party raised the choice-of-law issue in the district court, "and thus it is not open to us to reconsider that issue, absent some compelling reason of policy." International Administrators, Inc. v. Life Insurance Co. of North America, 753 F.2d 1373, 1376 (7th Cir.1985); see also Gonzalez v. Volvo of America Corp., 752 F.2d 295, 299 (7th Cir.1985); Keene Corp. v. Insurance Co. of North America, 667 F.2d 1034, 1041 n.10 (D.C.Cir.1981), cert. denied, 455 U.S. 1007 (1982); cf. Michigan Chemical Corp. v. American Home Assurance Corp.., 728 F.2d 374, 377 (6th Cir.1984) (choice-of-law argument not raised in district court may not be raised on appeal). Moreover, conflict-of-laws rules "are appealed to only when a difference in law will make a difference to the outcome." International Administrators, 753 F.2d at 1376 n.4; Keene Corp., 667 F.2d at 1041. Since Michigan and Ohio law are the same with respect to the issues presented on appeal, see infra notes 2, 4 & 5, there is no conflict of laws, see Keene Corp., 1041 n.10.
 
 B. Breach of Contract
 
 8
 Plaintiff argues that regardless of the fact that the Agreement was completely integrated[1], the district court erred by refusing to consider extrinsic evidence for the purpose of interpreting the Agreement. The district court determined that "the parties intended the contract to be an integrated agreement of their expression," and that "plaintiff's belated attempts to vary the terms of the ... Agreement are unavailing." (emphasis added). The district court further determined that "[t]he fact that prior negotiations may have suggested a more extensive assumption of liability ... are (sic] simply insufficient to raise an issue of fact as to the integrated nature of the contract."
 
 
 9
 Under Michigan law, "[t]he parol evidence rule precludes the admission of evidence of antecedent understandings to vary or contradict a contract which the parties have agreed is complete and integrated." Omega Construction Co. v. Murray, 129 Mich. App. 509, 514, 341 N.W.2d 535, 538 (1983); see also Central Transport, Inc. v. Fruehauf Corp., 139 Mich. App. 536, 544, 362 N.W.2d 823, 827 (1984). The parol evidence rule does not, however, preclude use of extrinsic evidence as an aid in interpreting or construing ambiguous terms in a contract.[2] Goodwin, Inc. v. Coe, 392 Mich. 195, 209, 220 N.W.2d 664, 671 (1974); Badour v. Zifkin, 96 Mich.App. 325, 327, 292 N.W.2d 201, 203 (1980). Thus, the question presented is whether extrinsic evidence that the parties intended Welding & Cutting to assume liability for the missing cylinders merely aids in interpreting the Agreement's ambiguous language or actually varies or contradicts the Agreement's unambiguous language.
 
 
 10
 The district court's determination that the proffered evidence would have varied or contradicted the Agreement's unambiguous language was based upon a misquotation of Article 2.2 of the Agreement. Article 2.2 provides, in relevant part:
 
 
 11
 Liabilities Excluded. Buyer is not assuming the following liabilities:
 
 
 12
 (a) all liabilities and obligations of Welders Needs, Inc. for product liability for claims, accounts or causes of action accruing or arising prior to August 28, 1982.
 
 
 13
 Joint Appendix at 99 (emphasis added). The district court mistakenly inserted a comma between "for product liability" and "for claims." Read without the comma, Article 2.2 literally applies only to product liability claims and does not necessarily preclude the possibility that Welding & Cutting assumed liability for the missing cylinders.
 
 
 14
 The district court did not consider whether Article 2.3 of the Agreement, which allocated liabilities between WNI and Welding & Cutting, could be interpreted as requiring Welding & Cutting to assume liability for the missing cylinders. Article 2.3 of the agreement provides, in relevant part:
 
 
 15
 [A]11 debts, obligations, contracts, commitments, and liabilities incurred by Seller, in the ordinary course of business, subsequent to the close of business, August 27, 1982, shall be deemed to be the obligation of Buyer and shall be paid or otherwise discharged by Buyer and Buyer shall be entitled to all rights, assets, cash and accounts receivable accruing subsequent to this date."
 
 
 16
 Joint Appendix at 99 (emphasis added). The phrase "liabilities incurred" could refer to liability actually imposed or to the accrual of a claim. Thus, the agreement is sufficiently ambiguous to permit resort to extrinsic evidence.
 
 
 17
 Plaintiff proffered extrinsic evidence that the parties intended that Welding & Cutting would assume any liability for the missing cylinders. Carter Neff, WNI's attorney, deposed that Union Carbide objected to listing plaintiff as a creditor because there would be no liability if the cylinders were recovered. Further, Neff deposed that he discussed the issue with representatives of WNI, and that it was agreed that liability for the missing cylinders would be assumed by Union Carbide "as one of the debts or obligations following the August 27th or 28th, 1982 date." Finally, Neff deposed that he was assured by representatives of Union Carbide that any liability for the missing cylinders "would fall under activities that occurred after August 27, 1982." This evidence[3] and the ambiguous language of the Agreement were sufficient to preclude entry of summary judgment. See, e.g., Airmark, Inc. v. Advanced Systems, Inc., 715 F.2d 229, 230 (5th Cir.1985) (per curiam).
 
 C. Fraud
 
 18
 Plaintiff argues that the district court erred in refusing to find defendants liable for the debts of WNI on the ground that "some of the elements of a purchase in good faith were lacking" and "the creditors of the transferor were not provided for." The district court rejected this argument, noting that Welding & Cutting assumed close to $1,000,000 of WNI's liabilities. The district court further noted that there were (t no allegations or evidence suggesting that Welding & Cutting or Union Carbide acted in any manner whatsoever to the prejudice of existing WNI creditors in connection with the ... Agreement."
 
 
 19
 It is plaintiff's contention that "if a sale of assets is structured in such a way as to leave the seller without adequate means of meeting its obligations, then the buyer must, by law, assume all such obligations." Under Michigan law, the general rule is that "[i]f one corporation purchases the assets of another and pays a fair consideration therefor, no liability for the debts of the selling corporation exists in the absence of fraud or agreement to assume the debts." Turner v. Bituminous Casualty Co., 397 Mich. 406, 417 n.3, 244 N.W.2d 873, 878 n.3 (1976) (quoting Schwartz v. McGraw-Edison Co., 14 Cal. App. 3d 767, 780, 92 Cal.Rptr. 776, 783 (1971)); see also Pelc v. Bendix Machine Tool Corp., 111 Mich.App. 343, 351, 314 N.W.2d 614, 618 (1981). However, "[t]he transferee may be held liable for the debts of the transferor corporation ... where some of the elements of a purchase in good faith were lacking, or where the transfer was without consideration and the creditors of the transferor were not provided for ...." Turner, 397 Mich. at 417 n.3, 244 N.W.2d at 878 n.3 (quoting Schwartz, 14 Cal.App.3d at 780, 92 Cal.Rptr. at 783); see also Pelc, 111 Mich.App. at 351, 314 N.W.2d at 618.[4] Plaintiff failed to make any showing that the consideration paid by Welding & Cutting was inadequate, and plaintiff's unsupported allegation was not sufficient to preclude summary judgment. See, e.g., United States v. Potamkin Cadillac Corp., 689 F.2d 379, 381 (2d Cir.1982) (per curiam).
 
 D. Conversion
 
 20
 Plaintiff argues that since defendants "aided in the conversion of the cylinders," the district court erred in granting summary judgment on the conversion claim. The district court rejected plaintiff's argument, stating that "the uncontested evidence of record reveals that defendants have never received or possessed any of the subject carbon dioxide cylinders and that defendants have never contracted to purchase or receive the same." The district court also stated that the missing cylinders "were in the possession of WNI and its customers" and that the "uncontested evidence" showed that the cylinders were missing prior to 1982.
 
 
 21
 Under Michigan law, conversion is defined as of a distinct act of dominion wrongfully exerted over another's personal property." Rohe Scientific Corp. v. National Bank of Detroit, 133 Mich.App. 462, 468, 350 N.W.2d 280, 282 (1984). "A conversion can result only from conduct intended to affect the chattel," and requires proof that the defendant intended "to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights." W. Prosser & W. Keeton, The Law of Torts Sec. 15, at 92 (5th ed. 1984); see also Jackovich v. General Adjustment Bureau, Inc., 119 Mich. App. 221, 237, 326 N.W.2d 458, 465 (1982). Michigan apparently allows for recovery against one who actively aids or abets another in converting property. See Trail Clinic, P.C. v. Bloch, 114 Mich.App. 700, 706, 319 N.W.2d 638, 641-42 (1982) (dictum).[5] Defendants could not, however, have aided WNI in converting the missing cylinders since the evidence shows only that WNI lost or neglected to secure return of the cylinders. The remedy for negligent interference with a chattel is an action for negligence rather than for conversion. W. Prosser & W. Keeton, supra, Sec. 15, at 92; see also Jackovich, 119 Mich.App. at 237, 326 N.W.2d at 465. Thus, the district court did not err in granting summary judgment on the conversion claim.
 
 III.
 
 22
 The judgment of the district court is REVERSED, and the case is REMANDED to the district court for proceedings not inconsistent with this opinion.
 
 
 23
 WELLFORD, Circuit Judge, concurring in part and dissenting in part:
 
 
 24
 I am in full agreement with the per curiam opinion in all respects save that part concerning the contract claim. I do not deem the contract language unclear or ambiguous on the issue of defendant's assumption of liability for the cylinders. Article 2.2(d) expressly excludes all liabilities "not expressly assumed . under Article 2.1. " Article 2.1 does not provide for defendant's assumption of liability for the cylinders. Article 2.3, the basis for the per curiam's conclusion that would preclude entry of summary judgment, addresses liabilities incurred subsequent to August 27, 1982. The cylinders were admittedly lost or misplaced, however, prior to August 27, 1982.
 
 
 25
 Even if extrinsic evidence were to be considered, despite their completely integrated agreement language, I believe Neff's testimony clearly indicated that plaintiff's counter-proposal which would provide for Union Carbide's[1] assumption of liabilities was rejected. Neff testified that "we discussed the fact that no one really knew what the liability would be unless the cylinders were actually recovered. We discussed the fact that Union Carbide was intending to continue business with Carbonic and that if that business relationship continued, there may never be any liability ... so after our discussions, I talked to my client about it and we decided to revise the schedule of debts."
 
 
 26
 As the district court found, "Carbonic's contract for the sale and return of carbon dioxide cylinders was with WNI not Union Carbide or Welding & Cutting." i agree, furthermore, with the district court that "the record discloses no assumption of WNI's liabilities of this nature by either Union Carbide or Welding & Cutting." I would, accordingly, AFFIRM the district court's dismissal of this breach of contract cause of action.
 
 
 
 [1]
 An agreement is completely integrated "[i]f the parties intended the writing to be a complete expression of all the terms agreed upon, as well as a final expression of the terms it contains." A. Farnsworth, Contracts Sec. 7.3, at 451-52 (1982)
 
 
 [2]
 Ohio courts follow the same rules. See Janca v. First Federal Savings & Loan Association, 21 Ohio App.3d 211, 214, 486 N.E.2d 1216, 1219 (1985); Ameritrust Co. v. Murray, 20 Ohio App.3d 333, 335, 486 N.E.2d 180, 183 1984
 
 
 [3]
 Plaintiff makes reference in its reply brief to the deposition of Nathan Driggers, plaintiff's attorney, who, according to plaintiff, deposed that he was assured that liability for the cylinders had been assumed by Welding & Cutting. Defendants moved to strike the reference on the ground that the deposition was not a part of the trial court record. "Evidence not presented to the trial court may not be offered on appeal." Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc., 776 F.2d 646, 649 n.1 (7th Cir. 1985); see also Fed.R.App.P. 10 (record on appeal consists of "original papers and exhibits filed in the district court, the transcript of the proceedings, if any, and a certified copy of the docket entries prepared by the clerk of the district court"). The motion to strike is granted
 
 
 [4]
 Ohio courts apply the same rule. See Burr v. South Bend Lathe, Inc., 18 Ohio App.3d 19, 21, 480 N.E.2d 105, 10708 (1984) (per curiam)
 
 
 [5]
 The definition of conversion is the same under Ohio law. See Zacchini v. Scripps-Howard Broadcasting Co., 47 Ohio St.2d 224, 226, 351 N.E.2d 454, 456 (1976), rev'd on other grounds, 433 U.S. 562 (1977). It is, however, unclear whether Ohio permits recovery against one who aids and abets conversion
 
 
 [1]
 Union Carbide was the parent and owner of all stock in Welding & Cutting Supply Co